MARTIN SWIFT, Appellant, v. J. C. LEACH, J. A. Stiles, and W. R. Cibert, as the Board of County Commissioners of the County of Sioux and State of North Dakota, Respondents.

(178 N. W. 437.)

**Indians — trust-patent Indians who have several tribal relations and become civilized may be qualified electors.**

1. Trust-patent Indians holding allotted lands under the Federal Act of May 8th, 1906 (Burke Act) who have become civilized persons of Indian descent, and who have severed their tribal relations for two years next preceding an election, may be qualified electors at such election, under subdivision 2, § 121, North Dakota Constitution, as amended.

**Elections — state may confer right of suffrage.**

2. Although such trust-patent Indians are still dependent upon the Federal government concerning the rules and regulations enacted for their supervision, control and protection, under the national policy to assist the Indian towards emancipation, nevertheless, *where* it is shown that such trust-patent Indians have in fact become civilized persons of Indian descent and, in fact, for more than two years preceding a general election have actually severed their tribal relations and have adopted the modes and habits of civilized life, and, *where* it appears under the testimony of the Superintendents of the Indian Agency in charge of such Indians, both present and former, and others, that they were qualified as civilized persons, to be electors, and no objection or complaint on behalf of the Federal authorities was urged against their exercising such privilege, and, *where* it further appears that in the exercise of the state right of suffrage, under the Constitution of this state, there was and is no conflict or interference with the Federal policy of wardship towards such Indians, *it is held*, upon the record, that such trust-patent Indians were electors at the general election held on Nov. 5th, 1918.

Opinion filed May 26, 1920.

Election contest, upon the removal of a county seat, in Sioux County, *Crawford, J.*

From a judgment of dismissal, the plaintiff has appealed.

Affirmed.

*Sullivan & Sullivan,* for appellant.

The Indians are not a portion of the political community called the people of the United States; and, although not foreign nations or per-

sons, they always have been regarded and treated as distinct and independent political communities. Worcester v. Georgia, 5 Pet. 515; Cherokee Nation v. Georgia, 5 Pet. 1; United States v. Osborne, 2 Fed. 58; Elk v. Wilkins, 112 U. S. 94, 28 L. ed. 643, 5 Sup. Ct. Rep. 41, 45.

As to whether the evidence shows they have severed tribal relations or not. Bem-Wam-Bin-Ness v. Eshelbey, 87 Minn. 108, 91 N. W. 291.

The Indian cannot by his own act, without the consent of the government of the United States, sever his tribal relation, or release himself from the state of pupilage or the guardianship of the United States. Elk v. Wilkins, 28 L. ed. 647, 648.

In the absence of evidence that illegal votes cast at an election were given for any particular candidate, it is not error to apportion them among the several candidates and deduct pro rata from their respective scores. 15 Cyc. 372; Ellis v. May, 25 L.R.A. 331; Gibbons v. Shepard, 2 Brewst. (Pa.) 138; Finley v. Walls, 4 Cong. Elect. Cas. 367; Platte v. Goode, 4 Cong. Elect. Cas. 650.

*Miller, Zuger, & Tillotson* and *Edward S. Johnson,* for respondents.

The party holding the affirmative is required to prove the facts, and all the facts, necessary to make out a case. Briggs v. Christ, 28 S. D. 562, 134 N. W. 323.

To a state belongs exclusively the power to regulate suffrage and to determine who shall or who shall not be a voter. 10 Am. & Eng. Enc. Law, 2d ed. 570; Anderson v. Baker, 23 Md. 623; Huber v. Riley, 53 Pa. 112.

The 15th Amendment to the United States Constitution does not apply to Indians. 10 Am. & Eng. Enc. Law, 2d ed. 591; Helgers v. Quinney (Wis.) 8 N. W. 17.

In the relation of the government to the Indians, there is nothing affecting his right to vote in this state, or any other rights which he may possess under state laws. Marchie Tiger v. Western Invest. Co. 221 U. S. 286, 55 L. ed. 738; Comp. Laws 1913, § 4349.

The civil and political status of the Indians does not condition the government to protect their property or to instruct them. Their admission to citizenship does not deprive the United States of its power, nor relieve it of its duty, to control their property, to protect their

rights. United States v. Thurston County (Neb.) 74 C. C. A. 425, 143 Fed. 289; Richert v. Roberts County, 188 U. S. 432, 47 L. ed. 532; United States v. Osborne, 6 Sawy. 406, 2 Fed. 58; United States v. Rickert, 188 U. S. 432, 27 L. ed. 532; United States v. Celestine, 215 U. S. 278, 54 L. ed. 195; Hallowell v. United States, 221 U. S. 317, 55 L. ed. 750; United States v. Sandoval, 231 U. S. 48, 58 L. ed. 107; United States v. Nice, 241 U. S. 591, 60 L. ed. 1192; Williams v. Stenmetz (Okla.) 82 Pac. 986; Eells v. Ross, 64 Fed. 417. See also Frazee v. Spokane County (Wash.) 69 Pac. 783.

BRONSON, J. *Statement.*—This is an election contest involving the removal of the county seat of Sioux county. Fort Yates has been the county seat since the organization of the county. At the general election held on November 5, 1918, there was submitted to the electors the proposition of removing the county seat of Selfridge, a town located some 18 miles west of Fort Yates, on the Milwaukee railway. As officially canvassed 479 votes (330 men, 149 women) were cast for Selfridge, and 393 votes (263 men, 130 women) for Fort Yates. At such election 273 so-termed trust patent Indians voted upon this proposition, in four of the eleven precincts in the county. The Standing Rock Indian reservation includes practically all of such county and extends also into Carson county, South Dakota.

At Fort Yates, the Indian reserve, comprising six or seven quarter sections of land, has been reserved for the Federal Indian agency and government school. Here, the superintendent of the Indian agency, for many years, has resided, and now resides. His jurisdiction now extends over the entire Indian reservation, excepting the homestead lands. This reservation has been open for settlement and allotment, under Federal authority, from time to time, the last proclamation of the President being in March, 1915, when allotments were closed.

Homesteaders have settled all through the reservation. Through land sales and *fee patent* sales, the white men have moved in here and there. The Indians who hold their allotted land, either under fee patent titles or so-termed trust patent titles from the Federal government, may be found farming side by side with white persons. There are no Indians on the reservation in this county, now living in communities and farming in common. The Indians do not live in Indian villages. As stated by the superintendent of the Indian agency, the Indians live

just the same as white people; their principal occupation is farming, and stock raising. They are scattered throughout the county, farming individually.

The trust-patent Indians, who voted at such election, are those who have received so-termed trust patents, as Indians of the Sioux tribe in this reservation, pursuant to the Federal Burke Act of May 8, 1906. 34 Stat. at L. 182, chap. 2348, Comp. Stat. § 3951, 3 Fed. Stat. Anno. 2d ed. 830. This act amended the Dawes Act of February 8, 1887. It provides for the allotment of land in severalty to an Indian and the issuance to him of a patent to be held in trust, for his use and benefit, for a period of twenty-five years, or such enlarged period as the President should direct. In part, it specifically provides:

"And every Indian born within the territorial limits of the United States to whom allotments shall have been made and who has received a patent in fee simple under the provisions of this act, or under any law or treaty, and every Indian born within the territorial limits of the United States who has voluntarily taken up within said limits his residence, separate and apart from any tribe of Indians therein, and has adopted the habits of civilized life, is hereby declared to be a citizen of the United States, and is entitled to all the rights, privileges, and immunities of such citizens, whether said Indian has been or not by birth or otherwise, a member of any tribe of Indians within the territorial limits of the United States without in any manner impairing or otherwise affecting the right of any such Indian to tribal or other property; *Provided,* That the Secretary of the Interior may, in his discretion, and he is hereby authorized, whenever he shall be satisfied that any Indian allottee is competent and capable of managing his or her affairs at any time to cause to be issued to such allottee a patent in fee simple, and thereafter all restrictions as to sale, encumbrance, or taxation of said land shall be removed and said land shall not be liable to the satisfaction of any debt contracted prior to the issuing of such patent: *Provided, further,* that until the issuance of fee-simple patents all allottees to whom trust patents shall hereafter be issued shall be subject to the exclusive jurisdiction of the United States."

The cause was tried before the court, without a jury, in June, 1919. At the trial the present superintendent of the Indian reservation, as well as two former superintendents, testified. Other witnesses familiar

with the conditions of life in Sioux county, the tribal relations, the civilization, and habits of life of the Indians, whose right to vote was questioned, likewise, testified.

From the testimony of the present superintendent, it appears that pursuant to the Federal policy of supervision, control, and protection over the Indian, this superintendent has general supervision over these Indians in Sioux county. He testified that every Federal regulation is made with the idea of giving to the Indian more individuality and to make him more independent. That the policy is to make the Indian absolutely self-supporting. That the idea of this supervision is to make it advisory rather than compulsory. He testifies that we are supposed to assist them in every possible way that we can, and encourage them to take up whatever vocation they wish.

There exists in this county an Indian court, established under Federal regulations, composed of two Indians and one white person. Trust-patent Indians are subject to its jurisdiction, involving minor offenses and the settlement of disputes. These Indians, however, may and do resort to the state or Federal courts. He testifies that "most of the cases are now being taken into the state and Federal courts;" that they are gradually doing away with the Indian court; that formerly it had one term a month, now it has only two terms during a year, and involves mostly cases of domestic trouble, which are generally settled by advice. The county is also divided into farming districts, over each of which there is a farmer, a sort of better farming agent, under his supervision. These farmers direct methods of better farming for both fee-patent and trust-patent Indians. Three of these farmers in charge of such districts are Indians. These farmers supervise farming, stock raising, sanitation, and policing. In a manner they have jurisdiction over white people, if they trespass. He testifies that there is no apparent distinction between trust-patent and fee-patent Indians in their method of living. Concerning this lack of apparent distinction he testifies that the competency court might come here to-day and grant fifty patents in fee, to those that would be otherwise trust-patent Indians for a good many years. That we have a couple of hundred more that will be turned loose next time the competency court comes here. That it requires simply the signature of the Secretary of the Interior to make them fee-patent Indians. Simply a transition from one to the other.

Concerning their lands, stock, and machinery furnished them by the Federal government, and concerning moneys or property due them from Indian land sales or through inheritance, regulations exist concerning receiving and disposition of the same by the Indians. These Indians, however, may sell wheat that he has raised; he may hire and discharge help; he may purchase implements and make his own contract therefor; he may sell his personal property if it is owned and purchased by him with his own earned money. Generally these Indians are not restrained in their free movements. He testifies concerning the advance in education of the Indians, that twenty years ago the schools were all strictly governmental institutions; then they had two government schools and nine day schools; now there is one government boarding school and four day schools. There are now eleven public schools. A large per cent of the Indian children are now attending the public schools. Of the Indians that are able to read and write, he testifies that between the ages of seven and forty years the percentage is 90. That there is an evident desire to become educated and to train their children like white men; that 90 per cent of the Indians belong to some church; that they take an active interest in governmental affairs; that they readily and promptly responded to our Federal government in supplying men through the draft and by volunteers, during the World War. That they subscribed liberally and freely to Liberty Bonds, War Saving Stamps, and other financial aids through the war; that they maintained their own Red Cross chapters; that they have contributed in Sioux county about 71 per cent of the funds for charity.

Another witness, Mr. Carignan, was superintendent of the Indian agency from 1903 to 1908. He has resided in Sioux county for thirty-eight years. He testified that for some twenty years the Indians have ceased to live in bands under a chief. That there is no difference between the life and character of fee-patent and trust-patent Indians. That their educational qualifications compare favorably with white people. That they marry the same as white people; they have fixed abodes; they live as white people. That they are competent to handle their own affairs, and their knowledge of English is as good as the average white man. That they have severed their tribal relations and adopted the mode of civilized life, and are well qualified to become citizens of this state.

Another witness, Mr. Belden, was also at one time a superintendent of the Indian agency. He has known these Indians in Sioux county continually since 1906. He testifies that they are living on their allotments, generally as white people live. That they have ceased to live in tribes; they do not owe obedience to chiefs; they have severed their tribal relations; that their progress, education, and ability to participate in governmental affairs compares favorably with the whites.

Another witness, Judge McG. Beede, now county judge in that county, formerly a clergyman, testified that he has had experience of twenty-three years with the Indians; he knows them intimately; he distinguishes fee-patent and trust-patent Indians by looking them up on the books; that these Indians live the same as white people. They are law abiding, do not live in tribes under chiefs; that they marry under the civil laws of the state the same as whites, and that they are Christians. That they have severed their tribal relations and adopted civilized life for a period dating back at least twenty years.

Mr. Stiles, the defendant county commissioner, testified, that he lived tributary to the territory involved for some thirty-one years. That he knew of no Indian living in the county in tribal relations; that the Indians lived in the same communities as the white people and among the white people, and their mode of life does not differ greatly to any extent from the white man. That they make good citizens.

Other witnesses also testified, but no evidence was introduced in contradiction of the testimony given concerning the civilization and the habits of these Indians.

The trial judge found that these trust-patent Indians were civilized persons, and had severed their tribal relations more than two years next preceding such election; that they lived separate and apart from each other and intermingled with the white people who have purchased and own land on the reservation, and with whom they are intermingled. That they live in separate houses, have a rather high standard of intelligence and education; that they maintain their churches and schools and in all walks of life, such Indians are on a par with the average communities of whites. He concludes that such trust-patent Indians were entitled to vote under the Constitution and laws of this state. Pursuant thereto, judgment of dismissal was entered

on March 23, 1920. The contestant immediately appealed. The record was filed in this court herein on May 6, 1920.

*Issues.*—The appellant states the issue on this appeal is:

"Whether or not such trust-patent Indians are entitled to vote under the constitutional provisions of this state."

That this issue is made determinative upon the following propositions:

(1) That such trust-patent Indians were not citizens of the United States (Judge Crawford so found).

(2) That such trust-patent Indians are not civilized persons of Indian descent, who had severed their tribal relations two years next preceding the election contested.

(a) They are not civilized persons as contemplated by the Constitution.

(b) They have not severed their tribal relations.

(c) They cannot sever their tribal relations without the consent of the government of the United States.

(3) That such trust-patent Indians are under guardianship, and by reason of § 127 of article 2 Amendments to the Constitution of the state of North Dakota, cannot vote.

(4) That either such votes cast by such Indians should eliminate the total vote cast in Fort Yates, Porcupine, Cannon Ball, and Solen precincts or such votes should be apportioned between the two contestants and deducted pro rata from their respective scores.

(5) That by declaring such votes invalid, and by adopting either of the methods in four hereof to purge the election of such illegal votes, Selfridge carried the election by more than a two-thirds majority.

The respondent maintains that the record in this case clearly discloses that such trust-patent Indians are civilized persons of Indian descent, and have severed their tribal relations two years next preceding the election, and were constitutionally entitled to vote, at such election.

*Opinion.*—Able arguments and briefs have been presented by both parties. The fundamental questions involved affect and are of much importance to many residents of this state. The perplexing problem of the status of the Indian with relation to the state sovereignty is pre-

sented in connection with the Fedral laws and policy of emancipation towards citizenship, now maintained by the Federal government, concerning his property rights and personal rights and privileges.

For the trust-patent Indians, upon the facts in this record, our legal concern is the application of the Constitution and laws of this state consistent with the maintenance of and noninterference with the Federal laws and the Federal policy, concerning their status.

Our Constitution (art. 2, Amendments) provides:

"Sec. 121. Every male person of the age of twenty-one years or upwards, belonging to either of the following classes, who shall have resided in the state one year, and in the county six months, and in the precinct ninety days next preceding any election, shall be a qualified elector at such election.

"First—Citizens of the United States.

"Second—Civilized person of Indian descent, who shall have severed their tribal relations two years next preceding such election."

The state, through its sovereign power, has the power to confer or extend the right of suffrage. 10 Am. & Eng. Enc. Law, 570; Anderson v. Baker, 23 Md. 531, 570; Huber v. Reily, 53 Pa. 112.

It is subject, however, in the exercise of his power, to the Federal constitutional provisions and the Federal laws enacted in pursuance thereof. 15 Cyc. 280.

There is no question presented nor contention made that the state does not possess territorial jurisdiction over the lands allotted to the trust-patent Indians and upon which they resided. See State ex rel. Tompton v. Denoyer, 6 N. D. 586, 599, 72 N. W. 1014; State ex rel. Baker v. Mountrail County, 28 N. D. 389, 393, 149 N. W. 120.

It is evident, therefore, that trust-patent Indians, under the Constitution of this state, are electors, if, upon this record, they are civilized persons of Indian descent who have severed their tribal relations two years next preceding the election, unless such extension of the right of suffrage to them conflicts or interferes with Federal constitutional or statutory provisions in the Federal policy of guardianship maintained towards such Indians.

Do the record facts disclose that the trust-patent Indians involved are civilized persons of Indian descent who have severed their tribal

relations two years next preceding the election held? We are satisfied that the findings of the trial court are correct in that regard, and are to be adopted as such by this court. There is no evidence whatsoever in the record, of the existence of any tribal relations concerning these trust-patent Indians for a period of years extending more than two years next preceding the election. Over these Indians there are no chiefs, either hereditary or appointed.

There is no showing that these Indians follow any tribal customs commonly pursued by Indians; they do not lead a nomadic or wandering life; they have homes and fixed abodes; they are engaged in the pursuit of agricultural industry; they live intermingled with the whites, having adopted and following their customs.

The evidence given by the superintendent, present and former, and persons who have been familiar with these Indians for many years, amply discloses that these Indians have wholly severed the modes and habits of Indian life and all tribal customs. The evidence sustains the findings that these Indians are civilized persons obedient to the laws of the state, following the customs of the white man in marriage and domestic life, in agricultural pursuit, in education, and religious life.

The appellant contends, however, that the dependent relation which exists between the Federal government and these Indians, as disclosed by the record, shows that they have such a status that they cannot be deemed civilized persons, and that this dependent relation negatives the right to recognize such Indians as civilized persons. This will be discussed further in connection with this Federal relationship. In the cases cited by the appellant (Bem-way-bin-ness v. Eshleby, 87 Minn. 108, 91 N. W. 291; Opsahl v. Johnson, 138 Minn. 42, 163 N. W. 988) it was held in each case upon the facts, that the Indians were tribal Indians and had not adopted the customs and habits of civilization.

Does the extension of the right of suffrage to trust-patent Indians who are found to be civilized persons who have severed their tribal relations conflict or interfere with the Federal policy towards such Indians, enacted through constitutional and statutory powers?

Repeatedly the Federal courts have stated that this policy is for the purpose of preparing the Indians for the habits of civilized life, and ultimately the privileges of citizenship. They have become wards

SWIFT v. LEACH

of the nation, recognized to be in a state of pupilage or dependent condition by reason of their former status, an alien nations, in a sense, owing allegiance to Indian tribes. Elk v. Wilkins, 112 U. S. 94, 28 L. ed. 643, 5 Sup. Ct. Rep. 41. This policy of the Federal government, in connection with the Dawes Act, in Monson v. Simonson, 231 U. S. 341, 58 L. ed. 260, 34 Sup. Ct. Rep. 71, is stated as follows:

"The Act of 1887 was adopted as part of the government's policy of dissolving the tribal relations of the Indians; distributing their lands in severalty and conducting the individual from a state of dependent wardship to one of full emancipation, with its attendant privileges and burdens."

That this condition continues until the Federal government deems it proper to withdraw its protective laws may not be doubted. Elk v. Wilkins, supra. That the state sovereign power does not extend so as to affect the Federal means for carrying into effect this national policy towards the Indian must likewise be granted. United States v. Pearson, 231 Fed. 270. Even after the Indian, subject to such wardship, becomes a citizen of the United States, and, by reason thereof, is entitled to vote, still the supervision, control, and protection of the Federal government in maintaining this national policy may still apply to him and restrain the exercise of state sovereignty in antagonism to this policy. United States v. Nice, 241 U. S. 591, 60 L. ed. 1192, 36 Sup. Ct. Rep. 696; Marchie Tiger v. Western Invest. Co. 221 U. S. 286, 55 L. ed. 738, 31 Sup. Ct. Rep. 578; United States v. Celestine, 215 U. S. 278, 54 L. ed. 195, 30 Sup. Ct. Rep. 93; United States v. Rickert, 188 U. S. 432, 47 L. ed. 532, 23 Sup. Ct. Rep. 478.

This policy of protection extending both to the property and the person of the Indian may exist and be continued, therefore, even though the Indian has become not only an elector, but also a citizen of the United States. The provisions of our Constitution relied upon by the appellant, which provide that no person who is under guardianship, *non compos mentis,* or insane shall be qualified to vote at any election (§ 127) has no application to this Federal status of the Indian. If it did have application, it would serve to disqualify the Indian from voting by reason of the status, whether he was a citizen of the United States, or a civilized person of Indian descent who has severed his tribal relation, under the constitutional provision (§ 121) hereinbefore

quoted. Upon this record, however, in extending the right of suffrage to these Indians, the state is simply acting consonant with the established policy of the Federal government to assist the Indian. It is not seeking in any manner to conflict or interfere with this Federal policy, but, in fact, to aid and assist it.

The appellant contends, however, that these Indians may not sever their tribal relation without the consent of the Federal government, and that the record does not disclose such consent in behalf of trust-patent Indians. Even though this principle be conceded, this record does disclose that this tribal relation has ceased for years. That the national policy towards these Indians has been to promote and foster this severance, and to bring these Indians to the ranks of citizenship as rapidly as possible. All of the Indian superintendents, present and past, three of them, who testified, affirm the nonexistence of tribal relations. Not a word in the record is stated by the Federal authorities, past or present, of any objection to this severance, in fact, of the tribal relations. No complaint is voiced by the Indian superintendent, now in charge, that the Federal government has not consented to this actual severance of such tribal relations. On the contrary his testimony is to the effect that the Federal government has promoted and fostered such severance.

It may be recognized as true that the conferring upon these Indians of the privileges of United States citizenship, and the release of this superintendence, control, and protection in connection with the policy of wardship towards the Indian, requires the consent of the Federal government, and to that extent the tribal relation or status is considered retained, when the Indian seeks to violate this status or state sovereignities attempt to infringe thereupon, but assuredly the national policy as directed towards the Indians concerned herein has been to dissolve, and its efforts devoted to sever such tribal relation in fact, and upon the status in fact, assuredly, the constitutional provision of this state should be applied.

In seeking to affirm this principle, the appellant has cited cases which may well illustrate the manner in which this matter of consent has been required. In United States v. Osborn, 2 Fed. 58, 61, an Indian not born a citizen could not become a citizen without the consent of the Federal government. In Elk v. Wilkins, supra, an Indian, at

Omaha, Nebraska, who had adopted the customs of the whites and abandoned the tribal relation, was neither a citizen of the United States nor a voter in Nebraska, because neither sovereignty had conferred upon him the privilege or its consent. In United States v. Rickert, 188 U. S. 433, 47 L. ed. 532, 23 Sup. Ct. Rep. 478; and United States v. Pearson, 231 Fed. 270, actions were maintained to restrain the collection of state taxes levied in South Dakota upon the property of Indians connected respectively with the Rosebud and Cheyenne Federal agencies, in contravention to the Federal policy concerning trust property given to the Indians. In these cases the continuance of this condition of wardship and dependence free from the interference by the state sovereignty is upheld. In United States v. Nice, supra, a prosecution was maintained for the sale of liquor to a trust-patent Indian, a member of the Sioux tribe in South Dakota. Even though the Indian was a citizen by virtue of a trust patent given under the original Dawes act (and so a voter), it was held that the dependent condition of the Indian still continued subject to Federal control until Congress determined to dissolve the relation. It is further held, however, that citizenship is not incompatible with tribal relations, and may be conferred without completely emancipating the Indian and placing him beyond the reach of tribal governing.

These cases simply illustrate instances where an Indian has sought to exercise a right not conferred or extended, or where an attempt has been made to interfere with the Federal control, supervision, and protection pursuant to the national policy. The theory of the continuance of the tribal relation as asserted, or when stated as such, has been asserted or stated, not to show the necessity of the actual continuance of such relation, but the fact that the wardship of the Federal government is still continuing. This may continue under Federal authority to the Indians, who have become citizens, full fee-patent Indians, living apart and free from Indians or Indian tribes, and intermingled with the whites. Marchie Tiger v. Western Invest. Co. 221 U. S. 296, 55 L. ed. 738, 31 Sup. Ct. Rep. 578; Cherokee Nation v. Hitchcock, 187 U. S. 294, 47 L. ed. 183, 23 Sup. Ct. Rep. 115.

The fact that in the Burke act it is provided that until the issuance of fee-simple patents to allottees, they shall be subject to the exclusive jurisdiction of the United States, is not construed to mean that the laws

45 N. D.—29.

of this state which they are now enjoying and using do not extend to them, and that this state may not confer the right of suffrage when not in interference with the Federal laws and policy. See State ex rel. Tempton v. Denoyer, 6 N. D. 586, 599; 72 N. W. 1014; State ex rel. Baker v. Mountrail County, 28 N. D. 389, 393, 149 N. W. 120.

Upon this record, the facts show that these trust-patent Indians have long since severed, in fact, their tribal relations. The Federal policy as shown and disclosed has urged, directed, and promoted this actual severance of tribal relations. The Federal authorities, so far as they have appeared in this action, the superintendents of the agency in question, having the supervision and control of these Indians for many years, testify to the facts and affirm the conclusion that the tribal relations concerning these Indians have in fact long ceased. This sufficiently established the nonexistence of the tribal relations concerning such Indians under the constitutional provision of this state. The Federal authorities of the present and past, acquainted with these Indians and the conditions, not denying, not objecting, but affirming that these Indians are civilized persons who have severed their tribal relations, state, and, through their testimony, seek to have these Indians enjoy the privileges of electors in this state, all to aid and assist these Indians, consonant with the Federal policy of emancipation, in attaining a higher degree of civilization and interest in governmental affairs of our country.

In thus extending to such Indians the recognition of the right of suffrage, in North Dakota, pursuant to our Constitution, this record discloses no interference with this Federal policy of wardship. Upon this record, it may well be held that North Dakota, through its constitutional authority and laws, extends to such trust-patent Indians, peopling and tilling our soil, obeying our laws, and having adopted and observed the habits and mode of life of civilized persons, the right and the welcome to participate as electors in its government, so long as this privilege does not conflict nor interfere with the Federal policy of wardship and protection. The trial court's finding that such trust-patent Indians are electors under subdivision two of the constitutional amendment quoted, upon the facts in this record, is upheld. The determination of this question, being decisive of this appeal, renders it unnecessary to consider the other questions presented.

The judgment is affirmed, with costs.