565 F.2d 1032
 UNITED STATES of America, Appellant,
v.
Chauncey Wesley LONG ELK, Jr., Ralph Emeron Taken Alive,
Clarence Lorin Pay Pay, Donald Dean Martin, Adolph
Hepper, and Daris Alfred Janis, Appellees.
UNITED STATES of America, Appellee,
v.
Kermit Wesley BIRD HORSE, and Lynn Lawrence, Appellants.
 Nos. 76-1385 to 76-1391, 76-1344 and 76-1401.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Aug. 29, 1977.
Decided Nov. 16, 1977.
Rehearing and Rehearing En Banc Denied Dec. 28, 1977.
 
 F. J. Smith, Bismarck, N. D., argued and on brief and supplementary brief, for appellants.
 Tom D. Tobin, Winner, S. D., argued for appellants; on brief for appellees in 76-1385 to 76-1391; and on supplemental brief for defendants in 76-1385-76-1391 and 76-1344.
 Neil T. Proto, Atty., App. Section, Dept. of Justice, Washington, D. C., argued, for appellees.
 Reid Peyton Chambers, Washington, D. C., argued for appellees; filed supplemental brief and additional supplemental brief, for amicus curiae, Standing Rock Sioux Tribe.
 Steven E. Carroll, Atty., Dept. of Justice, Washington, D. C., William F. Clayton, U. S. Atty., and Robert D. Hiaring, Asst. U. S. Atty., Sioux Falls, S. D., Howard W. Paulsen, Legal Intern., on brief and reply brief, for appellants in 76-1385 to 76-1391.
 Earl R. Mettler, Winner, S. D., on brief, for appellees in 76-1385 to 76-1391; and on supplemental brief for defendants in 76-1385 to 76-1391 and 76-1344.
 Marvin J. Sonosky, Washington, D. C., on brief, for amicus curiae, Standing Rock Sioux Tribe.
 Harry R. Sachse, Washington, D. C., on supplemental brief for amicus curiae, Standing Rock Sioux Tribe.
 Sonosky, Chambers & Sachse, Washington, D. C., on additional supplemental brief of amicus curiae, Standing Rock Sioux Tribe.
 Harold O. Bullis (former U. S. Atty.), and H. Gary Annear, Asst. U. S. Atty., Fargo, N. D., on brief, for appellee in 76-1344 and 76-1401.
 Irvin B. Nodland, Bismarck, N. D., on brief, for appellant in 76-1401.
 Before BRIGHT, ROSS and WEBSTER, Circuit Judges.
 BRIGHT, Circuit Judge.
 
 
 1
 These appeals raise an important question of whether federal jurisdiction exists over criminal offenses committed within that portion of the Standing Rock Indian Reservation opened to settlement by a 1913 congressional enactment. The Government has charged the defendants in these cases with committing crimes in that territory. If the 1913 Act diminished the reservation, the charges must be dismissed, but if the Act did not diminish the reservation, the federal courts possess jurisdiction over the crimes allegedly committed by these defendants.
 
 
 2
 I. Background.
 
 
 3
 Two groups of cases are joined together in this appeal. The first group arises from indictments issued by a South Dakota federal grand jury against Chauncey Wesley Long Elk, Jr., an Indian, and four other Indians (Taken Alive, Pay Pay, Martin, and Janis) for various offenses committed within Indian country, in violation of 18 U.S.C. § 1153 (1970), and against Adolph Hepper, a white man, on charges on assaulting an Indian within Indian country, in violation of 18 U.S.C. § 1152 (1970). All of the alleged offenses occurred at McLaughlin, South Dakota. The United States District Court for the District of South Dakota granted the defendants' motion to dismiss the indictments for lack of jurisdiction, holding that the United States, by the Act of February 14, 1913, ch. 54, 37 Stat. 675 (1913), had disestablished that part of the Standing Rock Indian Reservation where the alleged crimes had taken place.[1] The United States appeals the dismissal of these six indictments.
 
 
 4
 The second group of cases arises from indictments in North Dakota against Kermit Wesley Bird Horse and Lynn Douglas Lawrence, both Indians, charging them, under 18 U.S.C. § 1153 (1970), with the burglary of Ed's Bar in Fort Yates, North Dakota. These criminal defendants challenged the court's jurisdiction claiming, as did the defendants in Long Elk, that the Act of 1913 had disestablished the part of the Standing Rock Reservation on which the alleged offenses were committed. The court rejected this argument. Thereafter, Bird Horse and Lawrence were convicted of the charges in separate jury trials.[2] On these consolidated appeals Bird Horse and Lawrence again contest federal jurisdiction and, in addition, contend that the trial judge committed other prejudicial errors in the conduct of the trials.
 
 
 5
 The present appeals came before us in September of 1976. We postponed consideration of the issues pending a decision by the United States Supreme Court in Rosebud Sioux Tribe v. Kneip, 430 U.S. 584, 97 S.Ct. 1361, 51 L.Ed.2d 660 (1977), aff'g, 521 F.2d 87 (8th Cir. 1975), which dealt with a similar question of disestablishment of an Indian reservation located in South Dakota. Following the Court's issuance of the Rosebud opinion, the parties, at our request, submitted supplemental briefs and presented additional oral argument at our August 1977 session, addressing the jurisdictional issue in light of principles enunciated in Rosebud.
 
 
 6
 For reasons stated below, we reverse the dismissal of the indictments against Long Elk and the other South Dakota defendants, and we affirm the convictions of Bird Horse and Lawrence. We hold that the Act of 1913 did not disestablish any part of the Standing Rock Indian Reservation.
 
 
 7
 II. Jurisdiction.
 
 
 8
 Jurisdiction over the offenses allegedly committed by these defendants rests with the federal courts only if the acts occurred within the boundaries of the Standing Rock Reservation.[3] All defendants argue that the Act of 1913 removed from the reservation the areas where the offenses occurred.[4] The Government, along with the Standing Rock Sioux Tribe as amicus curiae, contends that the Act of 1913 did not reduce the size of the reservation.
 
 
 9
 We begin our discussion with a brief summary of the history of the Act.[5] The Treaty of April 29, 1868, 15 Stat. 635 (1868), between the United States and the chiefs of the various tribes of the Sioux Nation created the Great Reservation of the Sioux Nation, in the Territory of Dakota. Congress later, by the Act of March 2, 1889, ch. 405, 25 Stat. 888 (1889), carved that reservation into six smaller reservations, including Standing Rock.[6] The 1889 Act authorized the President to make allotments of land within the reservations to individual Indians and to instruct the Secretary of Interior to negotiate with the tribes for the purchase of unallotted portions of the reservations, subject to congressional ratification.
 
 
 10
 The westward movement of civilization at the turn of the century generated forces that gradually eroded the reservation system. The Indians, no longer able to depend on the diminishing herds of buffalo for their livelihood, accepted allotments of land under the terms of the Act of 1889 and turned to farming. During the same period settlers, railroad companies, and other commercial interests were pressuring Congress to open unallotted Indian lands for settlement by non-Indians. The Secretary of the Interior at various times dispatched Indian inspectors to negotiate with the tribes for the sale of the tribes' surplus land. These negotiations, when successful, culminated in a series of "surplus land statutes" passed by Congress in the early part of this century. Two such surplus land statutes, the Act of May 29, 1908,[7] and the Act of 1913, applied directly to the Standing Rock Indian Reservation.
 
 
 11
 Some surplus land statutes have operated to disestablish or diminish the size of the reservations,[8] while others have left unaffected the reservation boundaries.[9] As the Supreme Court noted in Rosebud Sioux Tribe v. Kneip, supra, 97 S.Ct. at 1363:
 
 
 12
 The mere fact that a reservation has been opened to settlement does not necessarily mean that the opened area has lost its reservation status.
 
 
 13
 In United States ex rel. Condon v. Erickson, 478 F.2d 684 (8th Cir. 1973), we held that the 1908 Act, which opened the western half of the Standing Rock Reservation and a portion of the Cheyenne River Reservation for settlement, did not diminish the Cheyenne River Reservation. That decision, therefore, implies that the Act of 1908 also left untouched the boundaries of the western half of the Standing Rock Reservation.[10]
 
 
 14
 The present appeals raise the issue of whether the Act of 1913, which opened the unallotted portions of the eastern half of the Standing Rock Reservation for settlement, diminished any portion of the reservation. The operative language of the Act reads:
 
 
 15
 Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That the Secretary of the Interior be, and he is hereby, authorized and directed, as hereinafter provided, to sell and dispose of all that portion of the Standing Rock Indian Reservation, in the states of South Dakota and North Dakota, lying and being within the following-described boundaries * * *. (37 Stat. 675.)
 
 
 16
 President Wilson formally opened the area for entry and settlement by the following proclamation of March 18, 1915:
 
 
 17
 I, WOODROW WILSON, President of the United States of America, by virtue of the power and authority vested in me by the Act of Congress approved February 14, 1913 (37 Stat. 675), do hereby prescribe, proclaim and make known that all the nonmineral, unallotted and unreserved lands within the Standing Rock Indian Reservation, in the States of North and South Dakota, shall be disposed of under the general provisions of the homestead laws of the United States and the said Act of Congress, shall be opened to settlement and entry, and shall be settled upon, occupied and entered in the following manner, and not otherwise * * *. (39 Stat. 1721.)
 
 
 18
 In concluding that the eastern half of the Standing Rock Reservation had been disestablished by the Act of 1913, the district court in Long Elk wrote:
 
 
 19
 The legislative history and documentation of the 1913 Act make it clear that this Act was merely a continuation of a congressional policy of reservation termination in response to the "familiar forces" noted in DeCoteau, supra, 420 U.S. at 431, 95 S.Ct. at 1086, 43 L.Ed.2d at 306, and Rosebud, (521 F.2d) at 91. (410 F.Supp. at 1178.)
 
 
 20
 We agree that "familiar forces" provided the impetus to opening the reservation for settlement, but that factor alone does not call for the result reached by the district court. Our analysis of the legislation, in light of the principles recently enunciated by the Supreme Court in Rosebud, requires that we reach a contrary result.
 
 
 21
 Our inquiry into the effect of the Act of 1913 must focus on congressional intent. Congress alone can create Indian reservations and Congress alone can disestablish a reservation or change its boundaries. DeCoteau v. District County Court, 420 U.S. 425, 95 S.Ct. 1082, 43 L.Ed.2d 300 (1975); Seymour v. Superintendent of Washington State Penitentiary, 368 U.S. 351, 82 S.Ct. 424, 7 L.Ed.2d 346 (1962); United States v. Celestine,215 U.S. 278, 30 S.Ct. 93, 54 L.Ed. 195 (1909). As the Court noted in Rosebud, 97 S.Ct. at 1363, "well-established legal principles" furnish guidelines for determining whether congressional enactments change the boundaries of a reservation. The Court stated these legal principles as follows:In determining this intent, we are cautioned to follow "the general rule that '(d)oubtful expressions are to be resolved in favor of the weak and defenseless people who are the wards of the nation, dependent upon its protection and good faith.' " The mere fact that a reservation has been opened to settlement does not necessarily mean that the opened area has lost its reservation status. But the "general rule" does not command a determination that reservation status survives in the face of congressionally manifested intent to the contrary. In all cases, "the face of the Act," the "surrounding circumstances," and the "legislative history," are to be examined with an eye towards determining what congressional intent was. (Rosebud Sioux Tribe v. Kneip, supra, 97 S.Ct. at 1363 (citations omitted).)
 
 
 22
 The Court's application of these principles in Rosebud and in DeCoteau aids us in interpreting the Act of 1913.
 
 
 23
 The dispute in Rosebud centered on a series of surplus land statutes passed by Congress in 1904, 1907, and 1910, opening parts of the Rosebud Indian Reservation in South Dakota for settlement. The Court concluded, after a careful review of the facts, that Congress clearly intended to diminish the size of the Rosebud Reservation.
 
 
 24
 The Court's analysis in Rosebud relied on two crucial factors. First, the 1904 Act contained cession language " 'precisely suited' to disestablishment." 97 S.Ct. at 1368. The operative language of the Act of April 23, 1904, ch. 1484, 33 Stat. 254 (1904), which ratified the agreement between the Rosebud Sioux Tribe and Inspector James McLaughlin of the Department of the Interior, reads as follows:
 
 
 25
 ARTICLE I. The said Indians belonging on the Rosebud Reservation, South Dakota, for the consideration hereinafter named, do hereby cede, surrender, grant, and convey to the United States all their claim, right, title, and interest in and to all that part of the Rosebud Indian Reservation now remaining unallotted * * *. (Emphasis added.)
 
 
 26
 Second, the Rosebud legislation originated in an agreement between the tribe and the Government unequivocally calling for the cession of reservation lands. In 1901, the Department of the Interior "obtained the written consent of three-fourths of the male Indian adults to the cession of some 416,000 acres of unallotted land in Gregory County for the sum of $1,040,000, subject to congressional ratification." 97 S.Ct. at 1365. However, Congress objected to direct and immediate payment for the land and refused to ratify that agreement.[11] Inspector McLaughlin negotiated a new agreement that provided for payment to the Indians. A majority of the tribe consented to this agreement. Although the Treaty of 1868 and the Act of 1889, establishing Rosebud and other reservations, required the consent of three-fourths of the male adult tribe members to sell any unallotted land, that consent provision was nullified in Lone Wolf v. Hitchcock, 187 U.S. 553, 23 S.Ct. 216, 47 L.Ed. 299 (1903), which held that Congress could unilaterally abrogate the provisions of an Indian treaty. Thus Congress legally could and did authorize the sale of unallotted land on the Rosebud reservation in its 1904 enactment, which incorporated verbatim the cession language of the 1901 agreement. 97 S.Ct. at 1368. The Court rejected the argument that the failure to obtain the three-fourths vote and the change in the method of payment implied a change in Congress' intent between 1901 and 1904. Instead, the Court concluded that the intent expressed in the 1901 agreement "was carried forth and enacted" in the 1904 Act. Id. at 1366. The Court found a similar continuity of intent in the 1907 and 1910 Rosebud legislation. Id. at 1373. These three congressional enactments, therefore, disestablished the designated portions of the reservation.
 
 
 27
 The Court discussed additional factors indicating that Congress intended to diminish the Rosebud Reservation. First, the presidential proclamation opening the land for settlement repeated the cession language of the 1904 Act. The Court recognized the proclamation as "an unambiguous, contemporaneous, statement, by the Nation's Chief Executive, of a perceived disestablishment of Gregory County * * * (reflecting) the clear import of the congressional action in the 1904 Act." Id. at 1371. Second, a provision of the 1904 Act granting to South Dakota two sections of every township for the use of its common schools and providing for payment for this land by the federal government indicated disestablishment because the corresponding provision in South Dakota's statehood act required those sections to be granted to the State only when "the reservation shall have been extinguished and such lands be restored to, and become a part of, the public domain." Id. at 1369. Third, the Court found support for disestablishment in the "subsequent jurisdictional history" of the area. The State of South Dakota had assumed unquestioned actual jurisdiction over the area, and neither Congress nor the Department of the Interior had challenged that jurisdiction. Id. at 1371. Finally, a provision in the 1910 Act "subjecting the opened land 'for a period of twenty-five years to all the laws of the United States prohibiting the introduction of intoxicants into the Indian country,' " indicated Congress' intention to sever the area from the reservation. Because similar prohibitions already applied to existing Indian country, the Court concluded that "the most reasonable inference from the inclusion of this provision is that Congress was aware that the opened, unallotted areas would henceforth not be 'Indian country,' because not in the reservation." Id. at 1376. Consideration of all relevant factors compelled the Court to conclude "that the Acts of 1904, 1907, and 1910 did clearly evidence congressional intent to diminish the boundaries of the Rosebud Sioux Reservation." Id. at 1363.
 
 
 28
 In construing the Rosebud statutes, the Court relied heavily on its earlier decision in DeCoteau v. District County Court, supra, 420 U.S. 425, 95 S.Ct. 1082, in which it considered whether the Lake Traverse Indian Reservation in South Dakota, created by an 1867 treaty, had been disestablished by the Act of March 3, 1891, ch. 543, 26 Stat. 1035 (1891). In that case, the tribe and Congress, by treaty, effected a simple and unqualified cession of all of the unallotted lands to the United States for a sum certain. The Court in noting the distinction between the facts in DeCoteau and those in Mattz v. Arnett, 412 U.S. 481, 93 S.Ct. 2245, 37 L.Ed.2d 92 (1973), and Seymour v. Superintendent of Washington State Penitentiary, 368 U.S. 351, 82 S.Ct. 424 (1962), said:
 
 
 29
 But in this case, "the face of the Act," and its "surrounding circumstances" and "legislative history," all point unmistakably to the conclusion that the Lake Traverse Reservation was terminated in 1891. The negotiations leading to the 1889 Agreement show plainly that the Indians were willing to convey to the Government, for a sum certain, all of their interest in all of their unallotted lands. (420 U.S. at 445, 95 S.Ct. at 1093.)
 
 
 30
 In contrast, "the circumstances surrounding congressional action in Mattz militated persuasively against a finding of termination." Id. at 448, 95 S.Ct. at 1094. The Court in DeCoteau concluded:
 
 
 31
 In the 1889 Agreement and the 1891 Act ratifying it, Congress and the Tribe spoke clearly. Some might wish they had spoken differently, but we cannot remake history. (Id. at 449, 95 S.Ct. at 1095.)
 
 
 32
 The history of the Act of 1913 is similar in many respects to that of Rosebud and DeCoteau. The statute resulted from the pressure of the "familiar forces" discussed above. The legislation provided for payment to the Indians as the Government received payment from the settlers. Inspector McLaughlin's negotiations with the tribe failed to result in approval by three-fourths of the adult males. The statute contained a school lands provision and an intoxicants provision. In Rosebud, the Supreme Court found all of these factors to be consistent with a congressional intention to disestablish the reservation.
 
 
 33
 But the contrasts between the statute here in question and those considered in Rosebud are more striking than the similarities. Similarly, the surrounding circumstances do not reflect any intent to disestablish any part of the Standing Rock Indian Reservation.
 
 
 34
 First, the face of the Act at issue here does not manifest an intent to terminate the reservation status of the land affected by it. The statute, as quoted above, directs the Secretary of Interior only "to sell and dispose of" the land. It contains no language "precisely suited to disestablishment," as did the statute in Rosebud.
 
 
 35
 Second, Inspector McLaughlin and the tribe never discussed and never reached any sort of agreement to terminate the reservation status of any part of the reservation.
 
 
 36
 Third, the legislative history of the statute, including committee reports and records of discussions on the floor of Congress, does not disclose an intention by Congress to terminate the reservation status of the land opened for settlement.
 
 
 37
 Fourth, the President's proclamation, quoted above, contains no words of termination or disestablishment of the reservation, as did the proclamation in Rosebud. It merely states that "unallotted and unreserved lands within the Standing Rock Indian Reservation * * * shall be disposed of (and) * * * shall be opened to settlement and entry * * *."
 
 
 38
 Fifth, the subsequent jurisdictional history does not establish clearly that the states of South Dakota and North Dakota have exercised jurisdiction over the part of the reservation affected by the Act. The district court in Long Elk, citing a joint brief of the defendants (appellees here), stated:
 
 
 39
 The State of South Dakota prior to 1972 had exercised jurisdiction for a period of sixty years in the City of McLaughlin where the offenses allegedly occurred. (410 F.Supp. at 1185.)
 
 
 40
 The tribe disputes that contention and, in addition, observes that North Dakota, by its Supreme Court's opinions, recognizes Standing Rock as undiminished in size. See Vermillion v. Spotted Elk, 85 N.W.2d 432 (N.D.1957); Swift v. Leach, 45 N.D. 437, 178 N.W. 437 (N.D.1920). See also White Eagle v. Dorgan, 209 N.W.2d 621 (N.D.1973).
 
 
 41
 Finally, the patterns of settlement differed radically. The Rosebud statute opened four entire counties for settlement. This area was almost completely unoccupied by Indians. By terminating the reservation status of the surplus land, Congress could facilitate white settlement without adversely affecting the tribe. In contrast, the Act of 1913 opened a mere 166,399 acres. Indians already occupied much of the area, so that the tracts available for settlement were interspersed among tracts allotted to Indians. We cannot assume that Congress would intend to change the reservation to an area without defined boundaries and, in addition, create a confusing checkerboard pattern of jurisdiction.[12]
 
 
 42
 We must conclude from these circumstances that Congress did not intend to disestablish the eastern portion of the Standing Rock Reservation.
 
 
 43
 As we have noted, the Act of 1913 shares some similarities with the Rosebud legislation that could support a contrary finding, but these few similarities do not provide the hard evidence necessary to overcome the general presumption against an intent to disestablish a reservation for
 
 
 44
 (d)oubtful expressions are to be resolved in favor of the weak and defenseless people who are the wards of the nation, dependent upon its protection and good faith. (Rosebud Sioux Tribe v. Kneip, supra, 97 S.Ct. at 1363.)
 
 
 45
 In Rosebud, the Court concluded that the three Acts in question satisfy the requirement that
 
 
 46
 a congressional determination to terminate (an Indian reservation) must be expressed on the face of the Act or be clear from the surrounding circumstances and legislative history * * *. (Id. at 1362.)
 
 
 47
 Here, to the contrary, we can find no such clear expression of congressional intent. We therefore must hold that the Act of 1913 did not diminish the size of the Standing Rock Indian Reservation.
 
 
 48
 III. Sufficiency of the Evidence (Bird Horse).
 
 
 49
 To connect defendant Bird Horse with the burglary, the Government relied on the testimony of two accomplices to the alleged crime, Howard Eagleshield and Alwin Redstone. Bird Horse, relying upon State v. Helmenstein, 163 N.W.2d 85 (N.D.1968), argues that under North Dakota law a conviction based solely on the uncorroborated testimony of an accomplice cannot stand.
 
 
 50
 The Government argues that in the Eighth Circuit "(i)t is well settled that a conviction can rest on the uncorroborated testimony of a codefendant or accomplice." United States v. Guy, 456 F.2d 1157, 1161 (8th Cir.), cert. denied, 409 U.S. 896, 93 S.Ct. 136, 34 L.Ed.2d 153 (1972); accord United States v. Micciche, 525 F.2d 544, 546 (8th Cir. 1975); Wood v. United States, 361 F.2d 802, 804 (8th Cir.), cert. denied, 385 U.S. 978, 87 S.Ct. 520, 17 L.Ed.2d 439 (1966); Williams v. United States, 328 F.2d 256, 259 (8th Cir. 1964).
 
 
 51
 In 18 U.S.C. § 1153 (1970), burglary is "defined and punished in accordance with the laws of the State in which such offense was committed." Although neither party's brief provides any support for its choice of law, Bird Horse apparently assumes that section 1153, in addition to adopting the definition and punishment of an offense under state law, also assimilates state law principles as to sufficiency of evidence.
 
 
 52
 We cannot agree. Although the statute adopts state law for certain purposes, the offense remains a federal offense and sufficiency of the evidence should be determined by principles of federal law. Cases under the Assimilative Crimes Act, 18 U.S.C. § 13, which also adopts state law, support this conclusion. See Puerto Rico v. Shell Co. (P. R.), Limited, 302 U.S. 253, 266, 58 S.Ct. 167, 82 L.Ed. 235 (1937); McCoy v. Pescor, 145 F.2d 260, 262 (8th Cir. 1944).
 
 
 53
 IV. Jury Instructions (Lawrence).
 
 
 54
 Lynn Douglas Lawrence, charged and convicted of burglary under 18 U.S.C. § 1153, alleges that he was intoxicated at the time of the offense, and on appeal he challenges the jury instruction on intoxication given by the court. At the time of the burglary and the trial, North Dakota's law on intoxication as a defense read as follows:
 
 
 55
 Intoxication. 1. Intoxication is a defense to the criminal charge only if it negates the culpability required as an element of the offense charged. In any prosecution for an offense, evidence of intoxication of the defendant may be admitted whenever it is relevant to negate the culpability required as an element of the offense charged, except as provided in subsection 2.
 
 
 56
 2. A person is reckless with respect to an element of an offense even though his disregard thereof is not conscious, if his not being conscious thereof is due to self-induced intoxication. (N.D.Cent.Code § 12.1-04-02 (1976).)
 
 The judge instructed the jury as follows:
 
 57
 Although intoxication or drunkenness alone will never provide a legal excuse for the commission of a crime, the fact that a person may have been intoxicated at the time of the commission of a crime may negate the existence of a specific intent.
 
 
 58
 So, evidence that a defendant acted or failed to act while in a state of intoxication is to be considered in determining whether or not the defendant acted, or failed to act, with specific intent, as charged.
 
 
 59
 If the evidence in the case leaves the jury with a reasonable doubt whether, because of the degree of his intoxication, the mind of the accused was capable of forming, or did form, specific intent to commit the crime charged, the jury should acquit the accused.
 
 
 60
 Lawrence objects to the instruction, claiming that the negative implication of the language "intoxication * * * alone will never provide a legal excuse" does not accurately reflect the meaning of the statute, which is framed in positive terms: "Intoxication is a defense * * *."
 
 
 61
 The statute does not provide an absolute defense based on intoxication. The defense of intoxication is available "only if it negates the culpability required as an element of the offense charged." The court clearly instructed the jury to consider intoxication in determining whether Lawrence acted with the specific intent charged. Although the instruction does not precisely reiterate the words of the statute, it does communicate the sense of the statute. Accordingly, we reject Lawrence's allegation that the giving of the foregoing instruction constituted prejudicial error.
 
 
 62
 V. Jury Selection (Lawrence).
 
 
 63
 Lawrence further claims that the court erred in denying his motion aimed at assuring a fair and impartial jury. Claiming widespread racial prejudice against Indians in Bismarck, North Dakota, the location of the trial, Lawrence requested an increase in the number of peremptory challenges and the right of his attorney on voir dire examination to individually question each juror outside the presence of other prospective jurors.
 
 
 64
 In support of his motion, Lawrence referred to the rulings of Judge Bruce Van Sickle of the District of North Dakota a few weeks earlier in the trials of Russell Charles Means and Thomas Richard Poor Bear, scheduled for Bismarck, North Dakota. In that case, Means and Poor Bear had presented the court with the results of a survey of attitudes of people in the Bismarck area toward Indians. The survey, conducted by the National Jury Project of New York City, tended to indicate that local citizens manifested prejudice against Indians. Judge Van Sickle took several steps to assure a fair and impartial trial, including changing the venue, increasing the number of peremptory challenges, and permitting extensive voir dire questioning by attorneys on the issue of racial prejudice.
 
 
 65
 Chief Judge Benson took judicial notice of the Means-Poor Bear ruling, but he decided that the survey did not apply to the Lawrence case. Publicity such as that surrounding the Means-Poor Bear prosecution did not exist in Lawrence's case. Accordingly, Judge Benson denied Lawrence's motion relating to jury selection. The record demonstrates no error in this ruling.
 
 
 66
 This court has addressed the problem of juror prejudice against Indians in the recent cases of United States v. Crow Dog, 532 F.2d 1182 (8th Cir. 1976), and United States v. Bear Runner, 502 F.2d 908 (8th Cir. 1974), in which we recommended that individual prospective jurors undergo thorough questioning about possible prejudice against Indians. Here, Chief Judge Benson offered to question the jurors individually on the subject of prejudice, if requested, but Lawrence's counsel refused to make such a request, stating:
 
 
 67
 I do not intend to ask this Court to ask questions of the jury with reference to racial prejudice because I do not think it is an effective way in fact, I think it is a counter-productive way of getting at the problem.
 
 
 68
 Although the court, in its discretion, may permit an attorney to conduct part of the voir dire, Lawrence's attorney demanded the exclusive privilege of interrogating jurors. The trial court did not err in rejecting that demand.
 
 
 69
 VI. Summary.
 
 
 70
 Finding no error in the proceedings before the United States District Court for the District of North Dakota, we affirm the convictions of Kermit Wesley Bird Horse and Lynn Douglas Lawrence. As to Chauncey Wesley Long Elk and the five other South Dakota defendants, we reverse and remand for trial in the United States District Court for the District of South Dakota.
 
 
 
 [1]
 The decision of the Honorable Fred J. Nichol, Chief Judge, United States District Court for the District of South Dakota, is reported as United States v. Long Elk, 410 F.Supp. 1174 (D.S.D.1976)
 
 
 [2]
 These cases were tried before the Honorable Paul Benson, Chief Judge, United States District Court for the District of North Dakota
 
 
 [3]
 The term "Indian country," as used in 18 U.S.C. §§ 1152, 1153, is defined in 18 U.S.C. § 1151 (1970), which reads in relevant part:
 (T)he term "Indian country," as used in this chapter, means (a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent * * *.
 
 
 [4]
 The Standing Rock Indian Reservation as originally constituted embraces all of Corson County, South Dakota, in which the town of McLaughlin is located, and all of Sioux County, North Dakota, including the town of Fort Yates
 
 
 [5]
 Background information is related in substantial detail in Rosebud Sioux Tribe v. Kneip, supra, 97 S.Ct. at 1364; DeCoteau v. District County Court, 420 U.S. 425, 95 S.Ct. 1082, 43 L.Ed.2d 300 (1975); and United States ex rel. Condon v. Erickson, 478 F.2d 684 (8th Cir. 1973)
 
 
 [6]
 The other five reservations are the Pine Ridge Reservation, the Rosebud Reservation, the Cheyenne River Reservation, the Lower Brule Reservation, and the Crow Creek Reservation
 
 
 [7]
 Act of May 29, 1908, ch. 218, 35 Stat. 460 (1908)
 
 
 [8]
 See, e. g., Rosebud Sioux Tribe v. Kneip, supra, 97 S.Ct. 1361 (Rosebud Indian Reservation); DeCoteau v. District County Court, supra, 420 U.S. 425, 95 S.Ct. 1082 (Lake Traverse Indian Reservation); United States ex rel. Cook v. Parkinson, 525 F.2d 120 (8th Cir. 1975) (Pine Ridge Indian Reservation)
 
 
 [9]
 See, e. g., Mattz v. Arnett, 412 U.S. 481, 93 S.Ct. 2245, 37 L.Ed.2d 92 (1973) (Klamath River Indian Reservation); Seymour v. Superintendent of Wash. State Penitentiary, 368 U.S. 351, 82 S.Ct. 424, 7 L.Ed.2d 346 (1962) (Colville Indian Reservation); United States ex rel. Condon v. Erickson, supra, 478 F.2d 684 (Cheyenne River Indian Reservation); City of New Town v. United States, 454 F.2d 121 (8th Cir. 1972) (Fort Berthold Indian Reservation)
 
 
 [10]
 The Supreme Court of South Dakota recently reached a contrary conclusion in Stankey v. Waddell, 256 N.W.2d 117 (S.D.1977). It held that a member of the Cheyenne River Sioux Tribe was subject to personal property taxes because the Act of 1908 had disestablished the portion of the Reservation in which the property was located. That court interpreted the legislative history of the Act and the record of the negotiations between the tribe and Indian Inspector James McLaughlin as manifesting a congressional intent to diminish the Reservation. The court questioned the continued validity of our decision in Erickson in light of the Supreme Court's recent opinions in Rosebud and DeCoteau
 In Erickson, we could find no clear expression of an intent by Congress to diminish the size of the Reservation. Both the language of the Act and its legislative history appeared to us to be equivocal. We find no reason now to question our decision in Erickson. Under the principles discussed later in this opinion, the result in Erickson harmonizes with the Supreme Court's results in Rosebud and DeCoteau and with the result we reach in the present case.
 
 
 [11]
 Under earlier surplus land statutes, Congress purchased the land directly from the tribe for a "sum certain" and then the President, by proclamation, opened the land for settlement under the general homesteading statutes. Congress later balked at the substantial outlay required by this method of payment. Subsequent statutes provided that the land be held in trust by Congress until sold to settlers, at which time the Indians would be paid. Rosebud Sioux Tribe v. Kneip, supra, 521 F.2d at 94-97
 
 
 [12]
 Under 18 U.S.C. § 1151(c) (1970), the federal government retains jurisdiction over Indian allotments, regardless whether they are located on a reservation. Therefore, if the Act of 1913 diminished the reservation, the federal government would exercise jurisdiction over the tracts owned by Indians, while the state government would exercise jurisdiction over neighboring tracts owned by non-Indians. As a result, law enforcement officers would need to consult land-tract books to determine whether a particular criminal act in the area constituted a state or federal crime; such an impractical result is not to be imputed to Congress without specific language to that effect. See Moe v. Confederated Salish and Kootenai Tribes, 425 U.S. 463, 478, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976); Seymour v. Superintendent of Wash. State Penitentiary, supra, 368 U.S. at 358, 82 S.Ct. 424; Beardslee v. United States, 387 F.2d 280, 286 (8th Cir. 1967)