UNITED STATES of America,
Plaintiff–Appellee,

v.

MALE JUVENILE (Pierre Y.),
Defendant–Appellant.

No. 00–30411.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 12, 2001.

Filed Feb. 7, 2002.

Michael Donahoe, Assistant Federal Public Defender, Helena, MT, for the appellant.

Klaus P. Richter, Assistant United States Attorney, Billings, MT, for the appellee.

Before B. FLETCHER, BRUNETTI, and FISHER, Circuit Judges.

## OPINION

BRUNETTI, Circuit Judge.

This appeal raises difficult and complex questions relating to federal jurisdiction over Native American juveniles. Once again, we must revisit the interplay of two statutes granting federal jurisdiction: those governing criminal jurisdiction over Native Americans and those governing federal juvenile delinquency. Both grants of jurisdiction, on their own, have provoked concern about the reach of the federal government and the rights of those brought into court via these statutes. Together, the concern is even greater.

Pierre Y. ("Pierre") is a Native American juvenile who was adjudged a juvenile delinquent in federal court for two burglaries committed on the Fort Peck Indian Reservation, after previously being tried and punished in tribal court for one of the two offenses. Pierre raises numerous chal-

lenges to his federal prosecution: he contends that federal jurisdiction does not exist over these offenses; that the proceedings violated his rights to due process and equal protection of the laws; that his confession should have been suppressed; and that his right to a jury trial was violated.

## FACTS

On March 5, 2000, Pierre was taken into custody by Fort Peck Tribal Police as a suspect in the burglary of Kae Spottedbull's house, after Spottedbull reported to the police that she saw Pierre running away from the residence shortly before she discovered a VCR, a Super Nintendo, and some video games missing from her residence. Pierre's mother was called to the police station, and she gave her permission for the police to question him. The tribal police advised Pierre of his Miranda rights, and he signed an advice-of-rights form. After indicating that he understood his rights and was willing to speak with the officers, Pierre admitted breaking into Spottedbull's house. He was released from custody after the interview.

Shortly thereafter, an unrelated investigation by tribal police linked Pierre to the theft of compact discs from the apartment of Derek Bridges. On March 7, 2000, after obtaining Pierre's mother's permission, tribal police contacted Pierre at Poplar Middle School to question him about the missing CDs. Police told him that he was not under arrest, but nonetheless advised him of his Miranda rights and obtained his signature on an advice-of-rights form. Pierre then admitted to the break-in of Bridges' apartment.

On March 13, 2000, a petition was brought against Pierre in Fort Peck tribal youth court for juvenile delinquency based on the first break-in. After a hearing, Pierre was sentenced to 90 days for theft and 90 days for burglary, to be served consecutively.

Two months later, on May 15, 2000, the United States charged Pierre with two counts of juvenile delinquency, relating to both incidents. The jurisdictional certification statement required by 18 U.S.C. § 5032 (the Juvenile Delinquency Act) to establish federal jurisdiction stated that: (1) the state of Montana did not have jurisdiction over the offenses and (2) the offenses involved a crime of violence and there was a substantial federal interest in the offenses to warrant federal jurisdiction.

Pierre filed a pretrial motion, asserting lack of federal jurisdiction, requesting suppression of his confessions and other tribal court records, and demanding a jury trial. The motion was denied without a hearing. After a bench trial, Pierre was adjudged a juvenile delinquent for both offenses and sentenced to 24 months in custody. He timely appeals.

## JURISDICTIONAL OVERVIEW

The exercise of federal jurisdiction over tribal youth results from the interplay between the General Crimes Act (18 U.S.C. § 1152, also known as the Indian Country Crimes Act), the Major Crimes Act (18 U.S.C. § 1153) and the Federal Juvenile Delinquency Act (18 U.S.C. §§ 5031 *et seq.*). An overview of how these statutes work together will be helpful in addressing each of Pierre's claims.

Native American tribes generally have exclusive jurisdiction over crimes committed by Indians against Indians in Indian country. However, two federal statutes provide for federal jurisdiction over such crimes. The first statute, 18 U.S.C. § 1152, known as the General Crimes Act, mandates that the "general laws" of the United States, which are applicable in federal enclaves such as military bases, apply in Indian country. However, there are

two important limitations on the scope of the Act: it does not extend to offenses committed by an Indian against another Indian or to any Indian who has been punished for that act by the local law of the tribe.[1] The second statute, 18 U.S.C. § 1153, known as the Major Crimes Act ("MCA"), partially abrogated the General Crimes Act by creating federal jurisdiction over fourteen enumerated crimes committed by Indians against Indians or any other person in Indian country, including arson, murder, assault with intent to kill, and burglary.[2] The MCA was enacted in response to "congressional displeasure over the Supreme Court's decision in *Ex parte Crow Dog*, holding that neither the federal nor territorial courts had jurisdiction to try an Indian for murder of another Indian on a reservation." Felix S. Cohen, *Handbook of Federal Indian Law* 300–01 (1982). Therefore, the enactment of the MCA "reflected a view that tribal remedies were either nonexistent or incompatible with principles that Congress thought should be controlling." *Keeble v. United States*, 412 U.S. 205, 210, 93 S.Ct. 1993, 36 L.Ed.2d

844 (1973). Significantly, the MCA does not contain an exception for Indians who have already been punished by the tribe.

Jurisdiction over juvenile defendants in the federal system is governed by the Federal Juvenile Delinquency Act ("FJDA"), 18 U.S.C. § 5031 *et seq.* Although the FJDA creates federal jurisdiction over alleged acts of juvenile delinquency, the alleged crime must be a "violation of a law of the United States" to trigger that jurisdiction. *Id.* § 5032. Also, as a jurisdictional requirement, the Act requires certification by the Attorney General that (1) the juvenile court or other appropriate court of a State does not have, or refuses to assume, jurisdiction over the acts of a juvenile; (2) the State does not have available programs and services adequate for the needs of a juvenile; or (3) the offense charged is a crime of violence that is a felony or one of several enumerated crimes and there is a substantial Federal interest in the offense. *Id.* Because certification requirements are disjunctive, a single basis for certification establishes jurisdiction. *United States v.*

1. The General Crimes Act, in its entirety, states that:

   > Except as otherwise expressly provided by law, the general laws of the United States as to the punishment of offenses committed in any place within the sole and exclusive jurisdiction of the United States, except the District of Columbia, shall extend to the Indian country.
   > This section shall not extend to offenses committed by one Indian against the person or property of another Indian, nor to any Indian committing any offense in the Indian country who has been punished by the local law of the tribe, or to any case where, by treaty stipulations, the exclusive jurisdiction over such offenses is or may be secured to the Indian tribes respectively.

   18 U.S.C. § 1152.

2. The Major Crimes Act, in its entirety, states:

   > (a) Any Indian who commits against the person or property of another Indian or

   > other person any of the following offenses, namely, murder, manslaughter, kidnapping, maiming, a felony under chapter 109A, incest, assault with intent to commit murder, assault with a dangerous weapon, assault resulting in serious bodily injury (as defined in section 1365 of this title), an assault against an individual who has not attained the age of 16 years, arson, burglary, robbery, and a felony under section 661 of this title within the Indian country, shall be subject to the same law and penalties as all other persons committing any of the above offenses, within the exclusive jurisdiction of the United States.
   > (b) Any offense referred to in subsection (a) of this section that is not defined and punished by Federal law in force within the exclusive jurisdiction of the United States shall be defined and punished in accordance with the laws of the State in which such offense was committed as are in force at the time of such offense.

   18 U.S.C. § 1153.

*Juvenile Male,* 864 F.2d 641, 646 (9th Cir. 1988). The certification requirements resulted from Congress' desire to keep juveniles out of the federal court system and instead "channel juveniles into state and local treatment programs." *Id.* at 644.

ANALYSIS

Against this backdrop, we now turn to Pierre's claims.

## I. CERTIFICATION

■ Proper certification is a jurisdictional requirement. *United States v. Doe,* 170 F.3d 1162, 1165 (9th Cir.1999). Certification under any one of the three provisions of section 5032 is sufficient to commit a juvenile to the federal court system. *Juvenile Male,* 864 F.2d at 646. Whether the government complied with 18 U.S.C. § 5032 is a matter of statutory interpretation which this court reviews de novo. *United States v. Juvenile Male (Kenneth C.),* 241 F.3d 684, 686 (9th Cir.2001) (citing *United States v. Doe,* 98 F.3d 459, 460 (9th Cir.1996)).

The certification filed in this case asserts two bases for jurisdiction: (1) the state of Montana (in which the Fort Peck Indian Tribe is located) does not have jurisdiction over the offense and (2) the offense involved a "crime of violence that is a felony" and a substantial federal interest exists in the case to warrant federal jurisdiction. Pierre challenges both grounds.

■ Pierre first argues that the certification is insufficient because the Attorney General failed to certify that the Fort Peck Tribe did not have, or would not assume, jurisdiction to adjudicate Pierre as a juvenile delinquent. Pierre contends that section 5032 requires such tribal certification.

We expressly considered and rejected a similar argument in *Juvenile Male,* 864 F.2d at 644–45. Observing that section 5032 and its legislative history were com-

pletely silent as to tribes, we found "no basis for assuming that Congress intended Indian juveniles otherwise subject to federal jurisdiction ... to be subject to tribal jurisdiction." *Id.* We further observed that Congress certainly had within its power the ability to include tribes within the certification process, but did not. *Id.* at 645. Our decision expressly relied on the Eighth Circuit's analysis in *United States v. Allen,* 574 F.2d 435, 438–39 (8th Cir. 1978), which concluded that the plain meaning of the word "State" in section 5032 does not include Indian tribes and thus consultation with the tribes is not required under § 5032(1). Pierre recognizes our prior holding, but argues that a 1990 amendment to § 5032 gives us reason to rethink it.

In 1990, Congress added a provision to section 5032 defining "State," for the purposes of the section, to include "a State of the United States, the District of Columbia, and any commonwealth, territory, or possession of the United States." Crime Control Act of 1990, Pub.L. No. 101–647, § 1205(n), 104 Stat. 4789, 4831–32 (1990) (codified at 18 U.S.C. § 5032). Pierre argues that Congress' inclusion of "territories" within the definition of "State" evinces an intent to include Indian tribes, thereby requiring the Attorney General to consult with the relevant tribal authority before certifying jurisdiction over Indian youth under section 5032(1) or (2).

In support of his argument, Pierre cites various authorities which indicate that Indian lands may, at times, be included in the meaning of the term "territory." However, Pierre concedes, as he must, that the meaning of the term "territory" as used in various federal statutes is often "ambiguous." *See Americana of Puerto Rico, Inc. v. Kaplus,* 368 F.2d 431, 436 (3d Cir.1966) (citing *People of Puerto Rico v. Shell Co.,* 302 U.S. 253, 258, 58 S.Ct. 167,

82 L.Ed. 235 (1937)) (the term "territories" is susceptible of varying interpretations and does not have a fixed and technical meaning in all circumstances). Because the "plain meaning" of the term "territory" is unclear, we look to traditional canons of statutory interpretation to inform our inquiry as to what Congress meant when it used the word "territory" in section 5032. *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253–54, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992).

Like the legislative history of the original act, the legislative history of the act adding the definition of "State" to section 5032 "is completely silent as to tribes." *Juvenile Male*, 864 F.2d at 644. There is no indication in the legislative history that Congress intended "territories" to include Indian tribes. *See* 136 Cong. Rec. 27575 (1990) (discussing reasons for amending various sections of title 18 to include a definition of "State").

A reading of section 5032 in its entirety shows that Congress was aware of its option to include tribal governments in the definition of "State," but chose not to do so. In another portion of the statute, relating to whether a juvenile may be charged as an adult, Congress made reference to the "criminal jurisdiction of an Indian tribal government." The reference, in its entirety, reads:

> Notwithstanding sections 1152 [General Crimes Act] and 1153 [Major Crimes Act], no person subject to the criminal jurisdiction of an Indian tribal government shall be subject to the preceding sentence for any offense the Federal jurisdiction for which is predicated solely on Indian country (as defined in section 1151), and which has occurred within the boundaries of Indian country, unless the governing body of the tribe has elected that the preceding sentence

have effect over land and persons subject to its criminal jurisdiction.

Although this reference was added to the statute in 1994, after the 1990 change in the definition of "State," it is nonetheless indicative of Congress's general awareness of section 5032's impact on tribal affairs. This reference, in the same statute, indicates that Congress is certainly aware of the interplay between section 5032 and potential tribal jurisdiction. Congress specifically provided for consultation with tribal governments regarding transfer of Indian youth to the adult system. However, Congress did not include "Indian tribal government" in the list of authorities to be consulted in the certification process. Thus, when the definition of "State" is read within the context of § 5032 as a whole, it appears that Congress did not intend to refer to tribal authorities when it included "territory" in the definition of "State." *See Russello v. United States*, 464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983) (citation omitted) (noting that the canon *expressio unius est exclusio alterius* instructs that "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion").

■ The assumption of legislative endorsement also supports the conclusion that Congress did not intend to include the tribes in the certification process. Prior to the 1990 amendment, we concluded that "[t]he language and history [of § 5032] provide no basis for assuming that Congress intended Indian juveniles otherwise subject to federal jurisdiction under the Major Crimes Act to be subject to tribal jurisdiction." *Juvenile Male*, 846 F.3d at 641. Similarly, the Eighth Circuit held that "[t]he plain meaning of these words,

that the certification procedure is limited in applicability to the exercise of concurrent state jurisdiction and the availability of state facilities, is inescapable." *United States v. Allen,* 574 F.2d 435, 438–39 (8th Cir.1978). In construing statutes, we presume Congress legislated with awareness of relevant judicial decisions. *Cannon v. Univ. of Chicago,* 441 U.S. 677, 696–704, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979). Accordingly, when Congress revisited the term "State" in 1990, its failure explicitly to include tribal governments in the definition may be interpreted as an endorsement of the judicial decisions excluding tribes from the definition of "State."

Finally, a common sense look at the passage of the 1990 amendment indicates that Congress did not intend to extend the certification requirements to the tribes through its enlarged definition of "State." Pursuant to Title XII of the Crime Control Act of 1990, Congress amended the definition of "State" not just in 18 U.S.C. § 5032, but in fourteen other federal statutory provisions, under a section of the Act entitled "Miscellaneous Criminal Law Improvements." [3] Since the redefining of the term "State" was part of a blanket amendment to numerous other statutes, the implication of construing "territory" to encompass Indian tribes would be far-reaching. If we were to find that Congress meant to include Indian tribes within the definition of "territory" in section 5032, we would similarly be required to conclude that Indian tribes will be affected by each of the amended statutes. Considering the federal government's special relationship with Indian tribes in terms of their federal regulation, it is unlikely that Congress intended to include Indian terri-

tory in such a varied array of statutes without explicitly so stating.

For these reasons, we hold that section 5032's amended definition of "State" does not include tribal governments and that the Attorney General was not required to consult with tribal authorities before certifying federal jurisdiction under 18 U.S.C. § 5032(1). Because the certification requirements are disjunctive, we need not reach Pierre's alternative argument concerning whether the Attorney General properly certified Pierre under 18 U.S.C. § 5032(3). We conclude that the certification requirement was met here because the Attorney General certified, under 18 U.S.C. § 5032(1), that the state of Montana lacks jurisdiction over Pierre with respect to his alleged act of juvenile delinquency.

■ Pierre alternatively challenges the constitutionality of 18 U.S.C. § 5032 by invoking the equal protection component of the Fifth Amendment's Due Process Clause. He contends that 18 U.S.C. § 5032 violates equal protection because it recognizes and allows a "youth oversight function" in United States possessions and territories, such as Puerto Rico and Guam, but denies that right to Indian tribes.

This argument is squarely foreclosed by our decision in *Juvenile Male.* Relying on *United States v. Antelope,* 430 U.S. 641, 97 S.Ct. 1395, 51 L.Ed.2d 701 (1977), we found no equal protection violation to exist "[b]ecause the difference in treatment [under 18 U.S.C. § 5032] between [an Indian] and a non-Indian arises from his political membership in the tribe rather than from his race .... " *Juvenile Male,* 864 F.2d at 646. Here, despite the 1990 amendment to § 5032, Pierre's argument is essentially

---

**3.** Sec. 1205 of Pub.L. 101–647, entitled "Application of Offenses to Possessions and Territories," amended the meaning of the term "State" in 18 U.S.C. §§ 232, 245, 402, 666(d),

1028(d)(5), 1030(e)(3), 1029(f), 1084(e), 1114, 1952(b), 1956(c), 1958(b), 2313, 2315, and 5032.

identical to those before the court in *Juvenile Male*—except that instead of pointing to differential treatment between States and tribes, Pierre points to differential treatment between U.S. territories and tribes. The distinction, however, is meaningless to our analysis.

■■■ The statutory classification distinguishing U.S. territories from tribes does not involve fundamental rights nor does it proceed along suspect lines. Thus, we must uphold the classification against Pierre's equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for section 5032's exclusion of tribes from the certification process. *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 313, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993). The government "has no obligation to produce evidence to sustain the rationality of a statutory classification"; "[t]he burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it." *Heller v. Doe*, 509 U.S. 312, 320, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993) (citation and quotations omitted). Pierre has failed entirely to meet his burden. Thus, his equal protection claim must fail.

## II. "VIOLATION OF A LAW OF THE UNITED STATES" UNDER THE FEDERAL JUVENILE DELINQUENCY ACT

■■■ Pierre asserts that the crime with which he was charged did not constitute a "violation of a law of the United States," as required under the Juvenile Delinquency Act, 18 U.S.C. § 5031. The relevant portion of § 5031 states: " '[J]uvenile delinquency' is the violation of a law of the United States committed by a person prior to his eighteenth birthday which would have been a crime if committed by an adult or a violation by such person of

section 922(x)." We review this question of statutory interpretation de novo. *Doe*, 98 F.3d at 460.

This requirement appears jurisdictional in nature; therefore, if Pierre did not violate a law of the United States, the district court did not have jurisdiction to adjudicate him a juvenile delinquent. Although no court has addressed whether this particular requirement is jurisdictional, we have held other requirements of the Federal Delinquency Act to be jurisdictional. In *United States v. Doe*, we held that, in order for a district court to have jurisdiction under the Federal Juvenile Delinquency Act, an information must be filed before the alleged juvenile delinquent's twenty-first birthday and must charge the juvenile with having committed the underlying offense while under the age of eighteen. *Doe*, 631 F.2d 110, 112–13 (9th Cir. 1980). If section 5031's age requirements are jurisdictional, it follows that the requirement that the alleged offense be a violation of "a law of the United States" is jurisdictional as well. *Cf. United States v. Welch*, 15 F.3d 1202, 1207 (1st Cir.1993) ("[T]he FJDA does not apply to 'a defendant who ... is not a juvenile and who has not committed an act of juvenile delinquency.' ").

Pierre was charged with burglary under the Major Crimes Act, 18 U.S.C. § 1153, and Montana Criminal Code Title 45, Chapter 6, Section 204. As stated above, the MCA creates federal jurisdiction over fourteen major offenses (including burglary) committed by Indians against Indians or any other person in Indian country. Under the MCA, if an enumerated crime is not defined and punished by federal law, the offense is "defined and punished in accordance with the laws of the State in which [the] offense was committed...." Since Pierre's offense, residential burglary, is not defined by federal statute, it is

therefore defined by reference to state law. *United States v. Bear*, 932 F.2d 1279, 1281 (9th Cir.1990). Accordingly, Pierre was charged with burglary under section 1153 by reference to Montana's state burglary statute.

Pierre argues that because his act of delinquency was determined by reference to substantive state law, his violation of section 1153 did not constitute a "violation of the law of the United States." He gleans support for his argument from *United States v. Bear*, in which we stated that the Major Crimes Act is "not itself a substantive penal statute[,as i]t does not purport to define or punish substantive crimes, such as burglary, that it lists." *Id.* at 1281. In his view, the Major Crimes Act gives federal courts jurisdiction over state law—not federal—offenses.

There are a number of problems with Pierre's reading of the MCA and his reliance upon *Bear*. First, our analysis in *Bear* has been read by this court to be applicable only to cases involving crimes committed before the 1990 amendment to the Sentencing Reform Act. Otherwise it has "no precedential value." *United States v. Pluff*, 253 F.3d 490, 493 (9th Cir.2001)

More importantly, however, the fact that no federal residential burglary statute exists, thereby requiring the incorporation of Montana's definition of burglary, does not strip the commission of burglary on an Indian reservation in Montana of its federal character. There is a crucial distinction between a statute that merely grants jurisdiction over state law offenses and a statute that creates a federal offense through the incorporation of a state-law definition. Pierre was not charged with, and did not violate, the Montana burglary statute; rather, he violated the Major Crimes Act, which incorporates the state law only for the purpose of definition. The Major Crimes Act is most definitely a law of the

United States, regardless of its use of state law for a limited purpose, and we hold that this law creates federal offenses. This view is supported by the fact that this Circuit and others have referred to violations of the Major Crimes Act as "federal offenses" in other contexts. *See United States v. Begay*, 42 F.3d 486, 498 (9th Cir.1994) (noting that section 1153 extended federal jurisdiction over certain "major crimes" even though "those crimes might not otherwise be *federal offenses* if committed by non-Indians ...") (emphasis added); *see also United States v. Long Elk*, 565 F.2d 1032, 1040 (8th Cir.1977) ("[T]he offense [under the MCA] remains a federal offense.").

■ We also find support for treating crimes enumerated in the Major Crimes Act, but defined by state law, as federal offenses in our analogous treatment of crimes charged under a similar statute, the Assimilative Crimes Act. "The ACA ... provides for federal jurisdiction over crimes committed in federal enclaves such as military bases." *Pluff*, 253 F.3d at 493. Recently, in *Pluff*, we found a comparison to the Assimilative Crimes Act to be enlightening when construing the Major Crimes Act, and we do so here as well. Similar to the ACA, "the Major Crimes Act is a gap-filling statute." *Pluff*, 253 F.3d. at 493. "For the sake of convenience, both statutes adopt state or territorial law to define crimes for which no federal definition exists." *Id.* at 494. Therefore, we think it significant for our analysis of the Major Crimes Act's treatment of state-defined crimes that the "ACA transforms a crime against the state into a crime against the federal government." *United States v. Kiliz*, 694 F.2d 628, 629 (9th Cir.1982). Thus, "the assimilated state law, in effect, becomes a federal statute." *Id.; see also United States v. Kearney*, 750 F.2d 787, 789 (9th Cir.1984)

("The Assimilative Crimes Act incorporates state substantive criminal law as federal substantive law."). We find there to be no practical difference between the purpose and application of the ACA and the MCA concerning this issue, and therefore treat offenses defined by state law as federal offenses under the Major Crimes Act.

Finally, the implications of Pierre's narrow reading of the language of the Federal Juvenile Delinquency Act, § 5031, are unsettling. It would effectively extinguish federal jurisdiction over Native American juveniles with respect to all of the major crimes enumerated in the Major Crimes Act, which were not expressly defined in federal statutes. This would certainly be a dramatic and unintended result, contrary to the purpose of both the MCA and the Juvenile Delinquency Act, in light of the fact that state courts do not have concurrent jurisdiction over such crimes and the tribal courts can impose no punishment in excess of one year of imprisonment and a $5000 fine. *See* 25 U.S.C. § 1302(7).

For the above reasons, we hold that Pierre did commit a "violation of a law of the United States," and that the district court did have jurisdiction pursuant to the Federal Juvenile Delinquency Act.

## III. DOUBLE JEOPARDY

Pierre raises two claims concerning a possible double jeopardy violation, due to his initial prosecution by the tribal authorities and his subsequent prosecution by the United States. His first claim is statutory, his second constitutional; we review both questions of law de novo. *See Doe,* 98 F.3d at 460; *United States v. Michael R.,* 90 F.3d 340, 343 (9th Cir.1996).

■ First, Pierre argues that the statutory prohibition against subsequent prosecution by the federal government after tribal adjudication and punishment, contained within the General Crimes Act, § 1152, should apply to his prosecution for burglary under the Major Crimes Act, § 1153. The relevant portion of the General Crimes Act states: "This section shall not extend ... to any Indian committing any offense in the Indian country who has been punished by the local law of the tribe." 18 U.S.C. § 1152. Basically, Pierre argues that we should import the jurisdictional exceptions from the General Crimes Act into the Major Crimes Act, for those crimes that are defined by state law.

■ Pierre's argument is belied by the language of the statutes, case law interpreting them, and legislative intent. First, the plain language of both the Major Crimes Act and the General Crimes Act stand in the way of Pierre's importation of the General Crimes Act's prohibition against double jeopardy into the Major Crimes Act. Second, the plain language of the General Crimes Act belies any reading that its prohibition should apply to the MCA. The opening clause of the General Crimes Act, section 1152, states that it applies to the "general laws" of the United States "[e]xcept as otherwise provided by law...." The Major Crimes Act, section 1153, is clearly a relevant law that provides "otherwise" in the case of the fourteen enumerated offenses. The MCA was enacted after the General Crimes Act in order to confer federal jurisdiction over specifically enumerated crimes committed by an Indian against an Indian in Indian country.

Furthermore, in *Begay,* we treated the Major Crimes Act as an exception to or abrogation of the General Crimes Act. *See Begay,* 42 F.3d at 498. Whereas the General Crimes Act was limited to crimes committed by an Indian against a non-Indian, the Major Crimes Act extended jurisdiction, for fourteen enumerated offenses, to crimes committed by an Indian

against Indian. In *Begay*, we stated that "[u]nder § 1153, the Major Crimes Act, Congress partially abrogated § 1152 by extending federal jurisdiction over Indians in Indian country for the commission of [fourteen] specific 'major' crimes." *Id.* Because we treat the MCA as an abrogation or exception to the General Crimes Act, it would be inappropriate to import the prohibition against double jeopardy from the General Crimes Act into the text of the MCA.

This result would be even more troublesome when we view it through the lens of the legislative intent behind the Major Crimes Act. The enactment of the MCA "reflected a view that tribal remedies were either nonexistent or incompatible with the principles that Congress thought should be controlling." *Keeble v. United States*, 412 U.S. 205, 210, 93 S.Ct. 1993, 36 L.Ed.2d 844 (1973) (also noting a similar purpose behind amendments to the Act, evidenced by congressional statements such as, "since Indian courts cannot impose more than a six-month sentence, the crime of aggravated assault should be prosecuted in Federal court, where the punishment of the offense will be in proportion to the gravity of the offense") Because the Major Crimes Act was enacted in response to purportedly inadequate tribal punishments, it would make little sense to allow a prior tribal punishment to prevent certain crimes from being prosecuted under the MCA. Accordingly, Pierre's suggested interpretation of the relationship between sections 1152 and 1153 is not supported by the well-documented purpose behind the Major Crimes Act's extension of federal jurisdiction.

■ Pierre also argues that his prosecution by the federal government for burglary, after his tribal prosecution, violated the constitutional prohibition against double jeopardy contained in the Fifth Amendment. This argument is foreclosed by *United States v. Wheeler*, 435 U.S. 313, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978). In *Wheeler*, the Supreme Court addressed the question of whether the Double Jeopardy Clause barred the federal prosecution of a tribe member who had previously been convicted in tribal court of an offense arising out of the same incident. *Id.* Answering in the negative, the Court held that, because Indian tribes are not federal agencies, but rather derive their power from their inherent and independent sovereignty, Wheeler's first prosecution was conducted by a sovereign other than the United States. *Id.* at 328. Accordingly, the subsequent federal prosecution did not violate the Double Jeopardy Clause. *Id.* at 329–330, 98 S.Ct. 1079. The situation in *Wheeler* is no different from the instant case.

However, Pierre argues that the 1990 amendments to the Indian Civil Rights Act eroded the inherent tribal sovereignty upon which the *Wheeler* decision relied. These amendments to which Pierre refers were generated in response to the Supreme Court's decision in *Duro v. Reina*, 495 U.S. 676, 110 S.Ct. 2053, 109 L.Ed.2d 693 (1990). In that case, the Court confronted the issue of tribal jurisdiction over the criminal actions of non-member Indians (i.e. Indians who were members of a tribe other than the prosecuting tribe) and held that tribes do not have retained tribal sovereignty over non-members of the tribe. *Id.* at 688, 110 S.Ct. 2053.

■ Within months of *Duro*, Congress amended the ICRA to legislatively overrule that decision and restore to the tribes the power to prosecute non-member Indians. *See* 25 U.S.C. § 1301(2), (3). This give-and-take of tribal authority created a question as to whether the tribe's power to prosecute non-member Indians was "inherent" in tribal sovereignty or "delegated"

by Congress. Under *Wheeler,* the nature of the tribes' power to prosecute is crucial to the double jeopardy analysis: if a tribe's power to prosecute derives from inherent sovereignty, then a subsequent federal prosecution is permissible. *Wheeler,* 435 U.S. at 322, 98 S.Ct. 1079 ("[T]he controlling question in this case is the source of this power to punish tribal offenders: Is it a part of inherent tribal sovereignty, or an aspect of the sovereignty of the Federal Government which has been delegated to the tribes by Congress?"). If, on the other hand, tribal jurisdiction derives from a congressional grant of power, the dual sovereignty doctrine is not applicable and a subsequent federal prosecution may implicate the Double Jeopardy Clause.

Admittedly, we have struggled with the nature of the power at issue in these cases. However, we have only struggled with that question as it relates to the prosecution of non-members. Thus, the resolution of that issue is irrelevant to that present in Pierre's case, as he is a member of the tribe and falls within the *Wheeler* analysis. Furthermore, the question of non-member prosecution was recently laid to rest in an en banc decision of this court, *United States v. Enas,* decided while this appeal was pending. *Enas,* 255 F.3d 662 (9th Cir.2001) (en banc) *cert. denied,* —— U.S. ——, 122 S.Ct. 925, 151 L.Ed.2d 888 (2002) There, we held that a tribal court exercising its power to prosecute a non-member Indian under the Indian Civil Rights Act acts as a separate sovereign, making a subsequent prosecution by the federal government permissible under the dual sovereignty double jeopardy doctrine. *Id.* at 667.

## IV. RIGHT TO TRIAL BY JURY

Pierre asserts two separate arguments regarding his right to a jury trial, one a constitutional claim and the other a matter of statutory interpretation. We review both de novo. *See Doe,* 98 F.3d at 460; *Michael R.,* 90 F.3d at 343.

■ First, Pierre contends that the "solid wall of circuit authority" denying juveniles the right to a jury trial was eroded by the Supreme Court's decision in *Jones v. United States,* 526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999). *Jones* held that certain factors which raised the maximum sentence to which an adult defendant was exposed were elements of the criminal offense rather than sentencing considerations, and as such must be submitted to a jury and proved beyond a reasonable doubt. *Id.* at 231, 119 S.Ct. 1215. *Jones* has no application here, as it only addressed the issue of what constitutes an "element" of a criminal offense and merely re-affirmed that all elements of a criminal offense must be presented to a jury. However, a criminal offense is not the equivalent of an adjudication of juvenile delinquency. Thus, *Jones'* holding does not undercut the well-established precedent that there is no constitutional right to a jury trial in juvenile delinquency proceedings. *See McKeiver v. Pennsylvania,* 403 U.S. 528, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971).

Furthermore, we recently revisited the continued validity of this issue and reiterated the principle that no constitutional right to a jury trial exists in juvenile delinquency proceedings. *United States v. Juvenile,* 228 F.3d 987, 990 (9th Cir.2000).

■ Pierre also argues that he was denied his state-law right to a jury trial. He contends that Montana's statutory right to a jury trial should have been imported into his federal delinquency proceeding by the Major Crimes Act, which provides that burglary must be "defined and punished in accordance with the law of [Montana]." 18 U.S.C. § 1153(b). Because appellant did not raise this issue

below, it is reviewed for plain error. *See* Fed.R.Crim.P. 52(b); *United States v. Romero–Avila,* 210 F.3d 1017, 1021–22 (9th Cir.2000).

The plain language of the Major Crimes Act does not require importation of statutory rights associated with state offenses. The MCA requires only that appellant's offense be "defined and punished" with reference to state law. A statutory right to a jury trial does not define the offense of burglary, nor is it included in the punishment of the offense.

We recently confronted a similar challenge in *Pluff,* in which the appellant argued that Idaho's law on double jeopardy should be applied to his prosecution under the Major Crimes Act. *Pluff,* 253 F.3d at 490. We rejected this argument, because "Congress did not intend federal courts to adopt wholesale a state's criminal and constitutional law." *Id.* at 491. The incorporation of state law only extends to the determination of "the applicable elements and sentencing schemes" of crimes that are not defined federally. *Id.* at 494.

The Eighth Circuit reached the same conclusion in *United States v. Long Elk,* 565 F.2d 1032 (8th Cir.1977), concerning a state's standard for sufficiency of evidence. The court noted that "[a]lthough [the Major Crimes Act] adopts state law for certain purposes, the offense remains a federal offense and sufficiency of the evidence should be determined by principles of federal law." *Id.* at 1040.

We find the state statutory right at issue here is similar to that in *Pluff* and *Long Elk* and therefore should not have been incorporated into this federal proceeding through the Major Crimes Act. Accordingly, we reject Pierre's claim.

## V. ADMISSIBILITY OF CONFESSION

■ Pierre makes two arguments regarding the admissibility in federal proceedings of his statements to tribal investigators. First, he argues that his statements were involuntary because he believed that they would only be used in a Fort Peck Tribal Court youth matter and could not be used in federal court. He also contends that his statements were confidential under tribal law and therefore should have been suppressed in federal proceedings.

The statements at issue were made on two separate occasions: during an in-custody interview on March 5 and, two days later, during a noncustodial interview that took place at Pierre's school. Pierre's mother was informed about both interviews, and Pierre was advised of his Miranda rights and signed an advice-of-rights form prior to both interviews. On both occasions, Pierre indicated that he understood his rights and was willing to speak with investigators. Pierre never asked to terminate either interview.

■ We review de novo the voluntariness of appellant's confession. *Miller v. Fenton,* 474 U.S. 104, 112, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985). In evaluating voluntariness, the "test is whether, considering the totality of the circumstances, the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne." *Derrick v. Peterson,* 924 F.2d 813, 817 (9th Cir.1991). Pierre offers no evidence of physical or psychological coercion or improper inducements by the government. Without evidence of coercion, the personal characteristics of the defendant are constitutionally irrelevant. *Id.* at 818. Pierre's misunderstanding about the purposes for which his statements could be used did not stem from misrepresentation by the tribal investigators and therefore does not, on its own,

constitute a showing of police coercion sufficient to warrant suppression of his statements.

■ Pierre also contends that the use of his statements by the federal government violated tribal law and therefore should have been suppressed. Assuming that Pierre is correct in his assertion that the use of these statements violates tribal law, we reject the contention that tribal law should govern the admissibility of statements in federal court.

■ Federal law governs federal proceedings. Although we have not previously addressed this issue as it relates to tribal law, we have confronted the analogous state-law situation. "[E]vidence seized in compliance with federal law is admissible without regard to state law." *United States v. Chavez–Vernaza*, 844 F.2d 1368, 1374 (9th Cir.1988). The Eighth Circuit has extended this principle to the context of tribal law, stating that, "[f]ederal, not tribal or state, law governs the admissibility of this evidence [in federal court]." *United States v. Hornbeck*, 118 F.3d 615, 617 (8th Cir.1997). This extension, although not explicitly addressed by this court, was intimated by our court in the dissent in *United States v. Doe*, 155 F.3d 1070, 1082 (9th Cir.1998) (en banc) (Hawkins, J., dissenting). There, the dissent suggested that "a violation of tribal law would probably not preclude the admission of a defendant's statement in federal court." *Id.* Because this principle is consistent with our rule regarding state-law violations, we adopt this rule today, and therefore hold that Pierre's statements were correctly admitted in federal

court regardless of a possible violation of tribal law.

■ Finally, Pierre's contention that a collusive relationship existed between the federal and tribal officers here warranting suppression of his confession is without merit. Pierre fails to point to any evidence in support of a finding of collusion between tribal and federal officers to circumvent his rights. Furthermore, Pierre asserts only a violation of his alleged tribal rights, not his federal procedural rights. In *United States v. Alvarez–Sanchez*, 511 U.S. 350, 359, 114 S.Ct. 1599, 128 L.Ed.2d 319 (1994), the Supreme Court recognized the possible scenario of collusion between federal and state or local authorities in violation of the suspect's *federal* procedural rights. As Pierre asserts only a violation of tribal law, his reliance on *Alvarez–Sanchez* is misplaced.

For the above reasons, we find that appellant's confession was properly admitted in the federal juvenile adjudication.

## VI. SENTENCING [4]

■ Pierre raises two arguments concerning his punishment under the Federal Sentencing Guidelines: first, that the Major Crimes Act required the district court to apply state law juvenile penalty provisions, rather than federal law, and second, that if the Federal Guidelines were correctly applied, then the ambiguity created by the contradictory language in the Major Crimes Act, § 1153(b), which directs district courts to apply state punishment to offenses defined by state law, and the Sentencing Reform Act, § 3351(a), which directs district courts to apply federal sen-

---

4. Strictly speaking, juvenile delinquency proceedings are civil rather than criminal proceedings. *United States v. Doe,* 53 F.3d 1081, 1083 (9th Cir.1995). Under the Federal Juvenile Delinquency Act, juvenile delinquents are not "sentenced." Rather, the district court holds a "dispositional hearing" at which it can order probation or official detention. 18 U.S.C. § 5037. However, juvenile delinquency dispositions are often referred to as "sentences," and we shall follow this custom here.

tencing law to offenses located in the Major Crimes Act, violates due process, because it deprives defendants of adequate notice regarding what sentencing scheme will determine their punishment.

Pierre is correct that the Major Crimes Act does contain the directive that any enumerated offense "not defined and punished by federal law ... shall be defined and punished in accordance with *the laws of the State* in which such offense was committed as are in force at the time of such offense." 18 U.S.C. § 1153(b) (emphasis added). And, it is true that residential burglary is not defined by federal statute. *Bear*, 932 F.2d at 1281.

■ However, the Sentencing Reform Act was amended in 1990 to ensure that Native Americans prosecuted for any crime under the MCA were sentenced under the Guidelines: "Except as otherwise specifically provided, a defendant who has been found guilty of an offense described in a federal statute, including *sections 13 and 1153 of this title* ... shall be sentenced in accordance with the provisions of this chapter." 18 U.S.C. § 3551(a) (emphasis added).

Indeed, in the only Ninth Circuit case addressing punishment for crimes listed in the Major Crimes Act, which arose before the amendment to the Sentencing Reform Act, this court acknowledged that "[b]y th[e] amendment [to the Sentencing Reform Act], Congress has made the Guidelines applicable to those convicted pursuant to the Indian Major Crimes Act, 18 U.S.C. § 1153." *Bear*, 932 F.2d at 1282 n. 1. Therefore, there is no question that the Guidelines currently apply to the MCA.

However, a federal sentence for burglary (or other crime defined by state law) under the Major Crimes Act is not subject solely to the Guidelines. Rather, we find that the Guideline range must still be confined by state law, as it must fall within the minimum, if any, and the maximum sentence established by state law. Although we have not previously addressed the cabining of the Guidelines by state law for the purpose of the Major Crimes Act, we find the Eighth Circuit's reading in *United States v. Norquay*, 905 F.2d 1157 (8th Cir.1990), although predating the 1990 amendment, to be instructive. There, the court held that the range of the sentence imposed for burglary is determined by state law, and within that range, is calculated according to the Guidelines. *Id.* at 1161. In doing so, the court compared its interpretation of the sentencing scheme for the MCA to that of the Assimilative Crimes Act, which adopts a similar method.

Although we previously criticized the *Norquay* analysis in our opinion in *Bear* regarding its creation of a "potpourri of both federal and state sentencing laws," we did so in an interpretation of the sentencing scheme before the amendment to the Sentencing Reform Act. *Bear*, 932 F.2d at 1282 n. 1. As we stated in *Pluff*, "*Bear* ... has no precedential value in cases involving crimes committed after the amendment." *Pluff*, 253 F.3d. at 493 (9th Cir.2001). Furthermore, the reasoning behind our criticism has been answered by the amendment to the Act. We found fault with *Norquay* for its reduction of the states' role in sentencing by allowing the application of the Guidelines to crimes defined by state law. However, because Congress explicitly amended the Sentencing Reform Act to make the application of the Guidelines unquestionable, *Norquay's* "potpourri of both federal and state sentencing laws" is a sensible reading of the interplay between the Major Crimes Act and the Sentencing Reform Act.

Furthermore, we have previously cabined the punishments provided under the

Guidelines within the state statutory minimum and maximum for violations under the Assimilative Crimes Act. *United States v. Reyes,* 48 F.3d 435, 438 (9th Cir.1995). Because of the similarity between the language of the two statutes, as well as the fact that Congress amended the Sentencing Reform Act at the same time to include both the ACA and the MCA, we adopt the same approach for the Major Crimes Act. *See* 18 U.S.C. § 13 (stating that a person "guilty of any act or omission which, although not made punishable by any enactment of Congress, would be punishable if committed or omitted within the jurisdiction of the State, Territory, Possession, or District in which such place is situated, by the laws thereof in force at the time of such act or omission, shall be guilty of a like offense and subject to a like punishment"); 18 U.S.C. § 1153(b) (stating that, if any offense listed in § 1153(a) is not "defined and punished by Federal law," it will be "defined and punished in accordance with the laws of the State in which such offense was committed as are in force at the time of such offense").

■ We note that the Sentencing Guidelines do not directly apply to juveniles, such as Pierre, who are adjudged delinquent under the Federal Juvenile Delinquency Act. U.S.S.G. § 1B1.12. However, they are relevant to determining the proper sentence under the Act. For instance, in the case of a juvenile adjudged delinquent who is less than 18 years of age, the Act limits the maximum term of official detention to the lesser of the period until the juvenile becomes 21 or the maximum term of imprisonment that would be authorized if the juvenile had been tried and convicted as an adult. 18 U.S.C.

§ 5037(c)(1). Here, Pierre was sentenced to two years in custody. As the statutory maximum for burglary under Montana law is 20 years, Pierre's sentence was appropriate. *See* Mont.Code Ann. 45–6–204(3). Pierre was 14 years old at the time he committed the offense. Thus, his sentence to two years of official detention is within the maximum term authorized by 18 U.S.C. § 5037(c)(1).

■ Next, Pierre contends that the interplay between the language in the Major Crimes Act dictating the application of state law and the language in the Sentencing Reform Act mandating the application of the Federal Guidelines leads to confusion and therefore deprives Indian defendants of adequate notice as to the punishment for certain crimes, in violation of his right to due process.

■ Sentencing provisions may violate due process if they do not afford fair notice of the penalty that applies to the forbidden conduct. *United States v. Batchelder,* 442 U.S. 114, 123, 99 S.Ct. 2198, 60 L.Ed.2d 755 (1979). Here, however, the amended Sentencing Reform Act provided Pierre with ample notice that he would be sentenced according to the Guidelines. Pierre cannot rely on the Major Crimes Act's contrary reference in support of his notice argument, because the congressional amendment to § 3551(a) manifests a clear intent to repeal the Major Crimes Act's wholesale incorporation of state law punishments. *See Donaldson v. United States,* 653 F.2d 414, 418 (9th Cir. 1981) (noting the "well-settled" rule that "where provisions in the two acts are in irreconcilable conflict, the later act to the extent of the conflict constitutes an implied repeal of the earlier one.").

Although it is true that we are adopting the cabining approach for the first time today, Pierre cannot rely on that to support his due process claim. The application of the maximum and minimum contained within the burglary statute merely limits the Guidelines' reach and does not alter the clear congressional intent to have the courts apply the Federal Guidelines.

AFFIRMED.