TALLMAN, Circuit Judge,
dissenting:
There is now a fifth dimension beyond that previously known to federal district judges. It is a new dimension of consequence-free criminality: a dimension of unpunished corruption, unsanctioned wickedness, and unchastened immorality. It is an area between a convict’s “first” term of supervised release, and her “second” term of supervised release.
Our story begins in a courtroom. The camera zooms in on the defendant’s table, where a young woman wipes away her tears. The somnolent voice of the narrator, Rod Serling, intones:
Imagine it is June 6, 2008. The location, Missoula, Montana. This is Michelle Wing, a convicted felon who’s in trouble once again. She’s been lying to her probation officer. Routine lies the judge will punish in a routine manner: by revoking supervised release and sending her back to jail for a few short months.
What the judge doesn’t realize, however, is that his act is not merely one of revocation, but of liberation.
Wing will now begin an iniquitous journey through space and time. Her companion on this journey will be fraud. Her route, embezzlement. That’s a signpost up ahead; her next stop: The Twilight Zone.
*875 As the narration fades and Wing leaves the courtroom, the camera follows her. Mystified by her good fortune but happy to exploit it, Wing takes full advantage of the benevolent parameters of this unique parallel dimension. In the three weeks between July 3 and July 23, 2008, alone, she executes eight fraudulent financial transactions totaling $240,000. She spends $600 on toys at Toys “R” Us. She pays a $900 dental bill with a forged check. And, for good measure, she outfits her many fraudulently purchased cars with fraudulently purchased wheels and tires.
The camera soon returns to the courtroom, where Wing’s parole officer is seen pleading with the Montana district judge. The officer tells of Wing’s two-month crime spree. He asks the judge to revoke her supervised release. But the judge— who had thought Wing was still under his supervision — can only stand by helplessly. He cannot punish crimes executed outside his rational world of crime and punishment. He has no jurisdiction over ... The Twilight Zone.
This story might have been fanciful until today’s opinion. But it is now all too real. The majority doesn’t just declare separate and distinct terms of sequential supervised release. It creates gaps between those terms. And for villains like Wing, those gaps present a metaphysical nether-world constrained only by the outer limits of criminal imagination. As this outcome is equal parts science fiction and legal fiction, I must respectfully dissent.
I
Admittedly, this case is a very difficult one. Although continuing misconduct by convicted felons, particularly embezzlers, is common in our penal experience, we are the first court to apply 18 U.S.C. § 3583(e)(3) to such a unique set of facts. As the majority recognizes, the plain language of the statute itself does not give a clear answer, and we must look elsewhere to discern congressional meaning.
Luckily, however, we are not the first court to interpret § 3583(e)(3). We should follow the reasoning of the United States Supreme Court, whose prior interpretation of this statute demonstrates that supervised release is not broken into terms and Twilight Zones. By rejecting the Court’s reasoning, the majority reaches a result I cannot join.
A
Johnson v. United States, 529 U.S. 694, 120 S.Ct. 1795, 146 L.Ed.2d 727 (2000), closely reviewed the language of § 3583(e)(3) to determine the scope of a district court’s authority to impose supervised release. The issue in Johnson was whether the statute authorized a district court to (1) revoke a defendant’s term of supervised release; (2) require the defendant to serve part of that term in prison; and (3) impose an additional period of supervised release following the period of revocation-based imprisonment. Although the issues in Johnson are slightly different from those raised here, both cases depend upon the effect of a revocation-based period of imprisonment on the preceding and succeeding periods of non-incarcerated supervised release time.
In Johnson, the Court focused on the revocation-based period of imprisonment in relation to the overall “term” of supervised release. The Court noted that § 3583(e)(3) allows a district court to “ ‘revoke a term of supervised release, and require the person to serve in prison all or part of the term of supervised release ....’” Johnson, 529 U.S. at 705, 120 S.Ct. 1795(quoting § 3583(e)(3)). Based on this language, the Court reasoned that the period of imprisonment resulting from *876 revocation “is not a ‘term of imprisonment’ that is to be served, but all or part of ‘the term of supervised release.’ ” Id. (quoting § 3583(e)(3)) (emphasis added). With this holistic understanding of a term of continuing supervised release — one that encompasses the temporary period of revocation-based imprisonment — the Court recognized that even a “revoked” term of supervised release “retain[s] vitality after revocation.” Id. at 707, 120 S.Ct. 1795. Thus, the Court held that “any balance [of supervised release] not served in prison” can be served as supervised release after the temporary period of imprisonment. Id.
The majority bifurcates the analysis by dividing supervised release into separate and distinct “first” and “second” terms. Employing this nomenclature, the majority accepts that Wing’s “second” term of supervised release did not begin until November 26, 2008, when she was released from the temporary period of imprisonment resulting from her June 2008 revocation. The majority insists that the district court could not revoke Wing’s “second” term of supervised release on November 25, 2008 — the day before she was released from prison — because a court cannot revoke supervised release before the supervised release begins. See 18 U.S.C. § 3624(e) (explaining that supervised release “commences on the day the person is released from imprisonment ... ”).
To reach this result, the majority opinion presupposes that the period from February 2004, when Wing was originally released from prison, through August 2008, when she self-reported back to prison following revocation, was her “first term” of supervised release. This “first term” of supervised release ended, says the majority, when the district court revoked it in June 2008, but permitted Wing to remain free from custody until the Bureau of Prisons designated a facility and a date of surrender. Likewise, Wing’s “second term” of supervised release was set to begin on November 26, 2008, when she was released from the revocation-based period of imprisonment. There are two glaring problems with this analysis.
First, under Johnson, a period of imprisonment resulting from a revocation of supervised release does not divide supervised release into “first” and “second” terms unrelated to one another. The statute itself does not mention “first” or “second” terms; it simply refers to a “term of supervised release,” all or part of which the court may require to be served in prison. Johnson recognized this, and did not define the period of supervised release that follows revocation-based imprisonment as a “second term” of supervised release. Rather, the Court recognized the post-imprisonment period as “the balance of’ a single, continuing term of supervised release, of which imprisonment was but one part. Johnson, 529 U.S. at 705, 120 S.Ct. 1795. Call it what you want — perhaps “intensive supervision in close custody” — but it is still supervised release.
Second, as stated above, the majority’s division of supervised release into separate and distinct terms creates gaps in the court’s supervision. In this particular case, we manage to rob the district court in Montana of the power to punish Wing for crimes she committed between the revocation of her “first” term of supervised release in June 2008 and the beginning of her “second” term of supervised release commencing in November 2008. This Twilight Zone — wherein Wing enjoyed the crime spree of her dreams — is not convincingly explained anywhere in the majority’s opinion, the statute in question, or any *877 other case.[1] Luckily for the citizens of Spokane and Missoula, Wing will still be held to account for the underlying crimes in her 2008 summer of fun: she pleaded guilty in the Eastern District of Washington to embezzlement activities that included her July transactions. If circumstances had been slightly different, perhaps through any number of technical legal errors that could have torpedoed her subsequent criminal prosecution, Wing could have walked out of prison on November 26, 2008, and gone right back to her old profession: destroying livelihoods and reputations through heartless financial crimes.
Based on a more faithful adherence to Johnson and the reasonable inference that Congress did not intend to create gaps in supervised release, we should soundly reject Wing’s semantical effort to divide supervised release into separate terms.
The majority strays from the Supreme Court’s treatment of § 3583(e)(3), despite the fact that Johnson is the only relevant decision interpreting this important subsection. The majority points out that Congress had already answered the question presented in Johnson by enacting § 3583(h), allowing district courts to impose additional periods of supervised release, and had also altered other language in the subsection. Based on this congressional action and a prior Ninth Circuit case interpreting a wholly different statutory section, see United States v. Xinidakis, 598 F.3d 1213 (9th Cir.2010), the majority holds that the district court’s reliance on Johnson was misplaced.
I concede, as did the Court in Johnson, that treating supervised release — including a period following revocation — as one, single term may sound “unconventional.” Johnson, 529 U.S. at 705, 120 S.Ct. 1795. But Congress has never acted to correct this reading of § 3583(e)(3). Since the Court’s decision in Johnson, Congress has amended § 3583 seven different times without altering any of the relevant terms interpreted in that case.[2] Although this is not dispositive evidence that Johnson (which has never been overruled) still controls here, it is at least some indication of Congress’s “endorsement of the judicial decision[]” in Johnson and its continuing vitality. United States v. Male Juvenile, 280 F.3d 1008, 1016 (9th Cir.2002) (“In construing statutes, we presume Congress legislated with awareness of relevant judicial decisions.”). We should therefore adhere to the Court’s reasoning in Johnson in affirming the district court action in this case.
B
Recognizing the district court’s uninterrupted authority over Wing would also be consistent with the purposes of supervised *878 release. We are concerned with curbing recidivism and promoting re-entry into the community. Supervised release “is a unique method of post-confinement supervision invented by the Congress for a series of sentencing reforms” included in the Sentencing Reform Act of 1984. Gozlon-Peretz v. United States, 498 U.S. 395, 407, 111 S.Ct. 840, 112 L.Ed.2d 919 (1991). By creating supervised release, Congress sought to give district courts broad authority to “protect the public and ‘to facilitate the reintegration of the defendant into the community.’ ” See United States v. Vallejo, 69 F.3d 992, 994(quoting U.S. Sentencing Guidelines Manual § 5D1.1 comment n.2 (1995)). A critical part of this authority is a district court’s ability to revoke supervised release and require the defendant to serve all or part of the period of supervised release in prison. 18 U.S.C. § 3583(e)(3).
Congress has expressly authorized district courts to consider eight factors when revoking a defendant’s supervised release. See § 3583(e)(3)(authorizing courts to consider the sentencing factors listed in 18 U.S.C. § 3553(a)(1), (a)(2)(B), (a)(2)(C), (a)(2)(D), (a)(4), (a)(5), (a)(6), and (a)(7)). Importantly for this case these factors include “the history and characteristics of the defendant,” § 3553(a)(1), as well as the need to “afford adequate deterrence to criminal conduct,” § 3553(a)(2)(B), and “protect the public from further crimes of the defendant.” § 3553(a)(2)(C). In addition, we have recognized that a district court “may appropriately sanction a violator for his ‘breach of trust’ ” when revoking supervised release. United States v. Miqbel, 444 F.3d 1173, 1182 (9th Cir.2006).
The district court properly considered these factors in revoking Wing’s supervised release. Given Wing’s “pathological” need to embezzle funds from employers, a substantial term of imprisonment was necessary to deter her criminal conduct and protect future victims.[3] The Montana district court recognized that Wing’s $700,000 embezzlement scheme in Spokane would never have happened but for the lenient sentence she received for her first embezzlement conviction.
Most importantly, the district court properly considered Wing’s egregious breach of the court’s trust. When Wing appeared before the court at her June 2008 revocation hearing, she feigned great remorse in tearfully admitting the minor violations charged in her first revocation petition. She then gave an emotional promise to the court and her probation officer, pledging “to give my 100 percent on everything” in the future. Finally, she asked the court for leniency for her children’s sake, testifying that she had “done everything I could do to stay out of trouble. I’ve met my obligations.” We now know this was all false. As the court recognized later, Wing “stood right here and boldface lied to me in an emotional display ... while she was in the middle of ripping these people off and stealing nearly a million dollars.” Telling such “boldface lies” to a district court judge while shedding crocodile tears certainly constitutes the kind of “breach of trust” that may be considered when determining an appropriate period of imprisonment.[4]
Punishing such breaches of trust also appropriately deters defendants from ad *879 mitting minor violations at a revocation hearing in the hope that serious, concealed violations will escape notice and punishment. The majority correctly recognizes that Wing would never have come forward on her own with the minor violations charged in the June 2008 revocation petition. Once charged, however, Wing had a huge incentive to conceal her past crimes and lie to the district court. Wing’s lies bought her more time to commit another quarter-of-a-million dollars’ worth of financial crimes. If Wing had somehow escaped conviction for these crimes in Eastern Washington, her criminal conduct would go completely unsanctioned. Thus, denying jurisdiction in this case would incentivize defendants to conceal crimes at a revocation hearing.
C
Finally, Wing objects to the district court’s exercise of jurisdiction because, she argues, it will result in piecemeal litigation that will rob defendants of finality and repose. That is a hollow argument from a recidivist offender. While I agree that district courts must not arbitrarily mete out punishment in the form of multiple revocations for the same conduct,[5] Wing’s argument does not change my reading of the statute in question given her continued misconduct. The statutory scheme already contemplates multiple revocations of supervised release by recidivists like Wing and places a hard cap on the total amount of revocation-based imprisonment and further supervised release time that a district court can impose.
In Wing’s case, she was convicted in 2001 of a Class B felony. See 18 U.S.C. § 656 (stating a maximum sentence of thirty years imprisonment for her initial bank embezzlement); 18 U.S.C. § 3559 (categorizing offenses punishable by twenty-five years to life imprisonment as “Class B” felonies). Under § 3583, Wing’s authorized term of supervised release could not exceed five years for her Class B felony, see § 3583(b)(1), and the longest additional period she could be forced to serve in prison based on a revocation of supervised release is three years. See § 3583(e)(3).
Because she was convicted in 2001, before the 2003 amendments to § 3583, Wing’s aggregate period of imprisonment for any and all revocations of supervised release cannot exceed three years. See United States v. Knight, 580 F.3d 933, 937 (9th Cir.2009) (citing United States v. Jackson, 329 F.3d 406, 407-08 (5th Cir. 2003) (collecting cases requiring aggregation of revocation-based imprisonment terms prior to 2003 amendments)). Thus, the district court’s most recent revocation of Wing’s supervised release — the second such revocation — would also be Wing’s last: she was previously imprisoned for three months for her first revocation, and she was sentenced to an additional thirty-three months of imprisonment for her second when her crime spree was discovered. When released from the thirty-three-month period of imprisonment, she would have reached the statutory cap. She would no longer be subject to supervised release, imprisonment, or any other action by the district court in Montana. This statutory limit adequately protects Wing’s interest in finality and repose, just as Congress intended.
II
Our story resumes at a prison. The camera zooms in on two female inmates being processed out at the end of their incarceration. Serling’s voice surfaces over this ominous scene.
*880 It’s now July 18, 2017, at the Federal Correctional Institution in Dublin, California. As Michelle Wing prepares to conclude her Eastern District of Washington sentence, a fellow prisoner is also being processed for release.
This other prisoner, Patty, has been serving three months on a revocation of supervised release.[6] Patty made her presence felt during her short time on the cellblock. She is widely believed to have strangled two other inmates and left a third in a coma after delivering a savage beating.
There is a preponderance of evidence linking Patty to these crimes. But she’s silenced all witnesses, and prosecutors have no choice but to withhold filing criminal charges.
The screen transitions to the setting of our final scene: the chambers of a federal district judge. Patty’s parole officer, conscious of the violence she will undoubtedly wreak upon innocent victims, begs the district court to revoke Patty’s upcoming period of supervised release. But in light of today’s opinion, the district judge can do nothing.
Although the court had jurisdiction to punish petty violations before imprisonment, and may eventually have jurisdiction to punish the inevitable crimes committed after imprisonment ends, there is a black hole squarely in the center of Patty’s otherwise-continuous period of supervised release. It is a zone the judge has helplessly observed since 2012. It is a void of time and space where congressional intent does not apply; where punishment for criminals and protection for victims is completely reversed. Welcome to this fifth dimension. Welcome to ... The Twilight Zone.

. The majority suggests the problem can be avoided by not admitting the convict to release on his or her own recognizance. But the Bail Reform Act does not contemplate that all persons be incarcerated on conviction and Wing took full advantage of the district court's misplaced trust in her fidelity to abide the conditions of her O.R. release. It is no answer to say that in hindsight, she should obviously have been remanded to custody in June 2008.

. See Judicial Administration and Technical Amendments Act of 2008, Pub. L. No. 110— 406, § 14, 122 Stat. 4291 (2008); Adam Walsh Child Protection and Safety Act of 2006, Pub. L. No. 109-248, § 2250, 120 Stat. 587 (2006); USA Patriot Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177, § 212, 120 Stat. 192 (2006); PROTECT Act, Pub. L. No. 108-21, § 101, 117 Stat. 650 (2003); 21st Century Department of Justice Appropriations Authorization Act, Pub. L. No. 107-273, § 2102, 116 Stat. 1758 (2002); USA PATRIOT Act of 2001, Pub. L. No. 107-56, § 812, 115 Stat. 272 (2001); DNA Analysis and Backlog Elimination Act of 2000, Pub. L. No. 106-546, § 7, 114 Stat. 2726 (2000).

. In particular, the court considered the importance of protecting victims like Wing’s Spokane-based employer, a victim whose small business was bankrupted and whose personal credit was destroyed while Wing enjoyed great seats at the Super Bowl.

. District Judge Donald Molloy described Wing's false testimony during her June 2008 revocation hearing as "the most egregious breach of trust that I think I have encountered in nearly 14 years on the bench.”.

. Such arbitrary revocations would still be reviewable for abuse of discretion.

. The majority tells us that 18 U.S.C. § 3624(e) makes it "clear" that Patty could not be on supervised release. The only thing clear about § 3624(e) is that it does not apply here. That section ensures that convicts do not get credit for supervised release while imprisoned for new criminal convictions. 18 U.S.C. § 3624(e) ("[Sjupervised release does not run during any period in which the person is imprisoned in connection with a conviction for a Federal, State, or local crime----”) (emphasis added). Section 3624(e) has nothing to do with revocations of supervised release, which are not mentioned anywhere in the section's text. This explains why Wing’s attorney failed to mention § 3624(e) upon direct questioning on this issue at oral argument.